**PRESIDENTS COUNCIL, DISTRICT 25, et al., Plaintiffs-Appellants,**

v.

**COMMUNITY SCHOOL BOARD NO. 25 et al., Defendants-Appellees.**

**No. 494, Docket 71-1958.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1972.

Decided March 21, 1972.

Alan H. Levine, New York City (New York Civil Liberties Union, New York City, Burt Neuborne, New York City, of counsel), for plaintiffs-appellants.

Harold F. Hay, Forest Hills, N. Y., for defendants-appellees.

O'Leary & O'Leary, Jamaica, N. Y., for intervenor defendant-appellee Antoinette McCarthy.

Irwin Karp, New York City, for The Authors League of America, Inc., amicus curiae.

Before MEDINA, LUMBARD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from an order of Chief Judge Jacob Mishler, United States District Court, Eastern District of New York, dismissing plaintiffs' civil rights action which was brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343, seeking an injunction and declar-

atory relief against Community School Board No. 25, Queens, New York, Cormac K. Meagher, Community Superintendent of Community School District No. 25, and Antoinette McCarthy, a representative of the Committee for Parents' Rights in Public Education. We affirm.

■ The plaintiffs-appellants in this case are the Presidents Council, District 25, an organization of presidents and past presidents of various parent and parent-teacher associations in the district, three junior high school students enrolled in schools in the district, seven parents and guardians of minors who attend junior high schools in the district, two teachers, a librarian and the principal of a junior high school, all within the district and under the jurisdiction of the Board. This litigation commenced as a result of the decisions of the duly elected Community School Board (hereinafter Board) of Community School District 25 (hereinafter District), which in executive session on March 31, 1971, voted five to three to remove from all junior high school libraries in the District all copies of *Down These Mean Streets,* a novel by Piri Thomas. At a public meeting on April 19, 1971 the res-

olution was again duly adopted by a vote of five to three. Pursuant to the resolution the defendant community superintendent had the book removed. At a public meeting of the Board on June 2, 1971 a resolution was unanimously passed permitting the book to be kept at those schools which previously had the book in their libraries but making it available on a direct loan basis to the parents of children attending these schools.

It is conceded by the parties in this suit that the Board was duly and legally elected and that the resolutions were duly adopted by the Board at the public meetings of April 19 and June 2, 1971. It is further uncontested that the students at the three junior high schools affected (Junior High School Nos. 185, 189 and 218) range in age from 11 to 15 years. The parties do not dispute that in New York City the selection of textbooks and other instructional material has been delegated by the Legislature of the State of New York to the Community School Board.[1] It is also clear that there are administrative procedures available to review the decisions of the Community School Boards in New York.[2] Any final administrative action

---

[1] N.Y.Educ.Law, McKinney's Consol.Laws, c. 16, § 2590–e(3) (McKinney 1970) provides:

§ 2590–e. Powers and duties of community boards

Each community board shall have all the powers and duties, vested by law in, or duly delegated to, the local school board districts and the board of education of the city district on the effective date of this article, not inconsistent with the provisions of this article and the policies established by the city board, with respect to the control and operation of all pre-kindergarten, nursery, kindergarten, elementary, intermediate and junior high schools and programs in connection therewith in the community district. The foregoing shall not be limited by the enumeration of the following, each community board shall have the power and duty to:

. . . . .

3. determine matters relating to the instruction of students, including the selection of textbooks and other in-

structional materials; provided, however, that such textbooks and other instructional materials shall first have been approved by the chancellor.

[2] N.Y.Educ.Law § 310(5)–(6) (McKinney 1970) provides for an appeal to the state commissioner of education by any person "conceiving himself aggrieved" by any action by the trustees of any school library in relation to the books therein or by any action by any district meeting in relation to the library. See e. g., In the Matter of Kornblum, 70 St.Dept.Rep.(Educ.) 19 (1949) where the commissioner held that a citizen and taxpayer had no constitutional right to compel the Board of Education of the City of New York to retain the magazine, "The Nation", in its school libraries.

Further, N.Y.Educ.Law § 2590–l (McKinney 1970) empowers the chancellor of the city school district of the City of New York to override any decision of a community board inconsistent with the educational policies of the city board.

is reviewable under Article 78 of the New York Civil Practice Law and Rules.[3]

The book, which has created the controversy and provoked the action of the Board, *Down These Mean Streets,* is an autobiographical account by Piri Thomas, of a Puerto Rican youth growing up in the East Side Barrio (Spanish Harlem) in New York City. Predictably the scene is depressing, ugly and violent. The argot of the vicinage is replete with four letter and twelve letter obscenities unreported by Tom Swift or even Tom Jones. Acts of criminal violence, sex, normal and perverse, as well as episodes of drug shooting are graphically described. The book has been made available to the court and in a soft cover reprint is available to the public for an investment of $1.25. Presumably the educational value of this work, aside from whatever literary merit it may have, is to acquaint the predominantly white, middle-class junior high school students of Queens County with the bitter realities facing their contemporaries in Manhattan's Spanish Harlem. Some parents objected to the public school library stocking the book, which they claimed would have an adverse moral and psychological effect on 11 to 15 year old children, principally because of the obscenities and explicit sexual interludes. The plaintiffs on the other hand have supplied affidavits from psychologists, teachers, and even children who claim the book is valuable and had no adverse effect on the development of the children of the District. One thirteen year old boy solemnly swears and assures us that the book has "literary merits" and is not a "corruptive influence".

Since the Legislature of the State of New York has by law determined that the responsibility for the selection of materials in the public school libraries in New York City is to be vested in the Community School Board (n. 1, *supra*), and the Commissioner of Education of that State has defined the purposes of the public school library,[4] and in further view of the procedures for administrative and state court review provided in New York (nn. 2 and 3, *supra*), we do not consider it appropriate for this court to review either the wisdom or the efficacy of the determinations of the Board. Our function is purely one of constitutional adjudication on the facts and the record before us: has the Board transgressed the first amendment rights of the plaintiff teachers, parents, librarian and children. In its most recent pronouncement on the subject the Supreme Court has stated: "By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (footnote omitted).

After a careful review of the record before us and the precedents we find no impingement upon any basic constitutional values. Since we are dealing not with the collection of a public book store but with the library of a public junior high school, evidently some authorized person or body has to make a determination as to what the library

3. See *e. g.*, Rosenberg v. Board of Educ., 196 Misc. 542, 92 N.Y.S.2d 344 (Sup.Ct. 1949).

4. The regulations of the Commissioner of Education of New York State provide: "The book collection in the secondary schools shall consist of books approved as satisfactory for: (1) Supplementing the curriculum, (2) reference and general information, (3) appreciation and (4) pleasure reading. The course of study and the interest of boys and girls of given ages and grades are factors which should play a large part in the selection of books for a school library. Books of established quality and authority in sufficient quantity to meet all school needs are recognized as necessary tools and materials of instruction." 8 N.Y.Code, Rules & Regs. (Educ.) § 91.1(b) (1966).

collection will be. It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent. The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions. If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school. Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here. See Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1051–1054 (1968).

In Epperson v. Arkansas, *supra*, the court did strike down a state statute which made it unlawful for a teacher in any state supported school to use a text book that teaches that men are descended from a lower order of animals. The court vitiated the statute on the specific ground that "the State may not adopt programs or practices in its public schools or colleges which 'aid or oppose' any religion." 393 U.S. at 106, 89 S.Ct. at 271. "The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Id.* at 107, 89 S.Ct. at 272. Here, patently we have no religious establishment or free exercise question, and neither do we have the banning of the teaching of any theory or doctrine. The problems of the youth in the ghetto, crime, drugs and violence

have not been placed off limits by the Board. A book has been removed but the librarian has not been penalized, and the teacher is still free to discuss the Barrio and its problems in the classroom. The action of the Board does not even preclude the teacher from discussing *Down These Mean Streets* in class or from assigning it for outside reading. In those libraries which have the book, the parent can borrow it and, if he sees fit, can loan it to his child if he wishes to read it.[5] The intrusion of the Board here upon any first amendment constitutional right of any category of plaintiffs is not only not "sharp" or "direct", it is miniscule.

Appellants' reliance upon Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) is puzzling. In that case the Court upheld the constitutionality of a New York statute (N.Y. Penal Law § 484–h (McKinney's Consol.Laws, c. 40, 1967)) which made it a crime to sell defined obscene material to minors under 17 years of age, whether or not the material would be obscene for adults. In upholding the concept of "variable obscenity" the court found the statute to be a rational legislative determination that the exposure of minors to such materials might be harmful and that the statute did not involve any invasion of constitutionally protected freedoms. Appellants' reading of the case as authority for the proposition that minors have an unqualified first amendment right of access to books, unless they are obscene under the statute, is totally unjustified. It equates the public school library, which has a function as an adjunct to the educational venture, with the entrepreneur seller of books who has no comparable responsibility. The public school library obviously does not have to become the repository, at public expense, for books which are

---

5. In Ginsberg v. New York, 390 U.S. 629 at 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) Mr. Justice Brennan, recognizing the prime responsibility of parents for the well-being of their children, pointed out that the statute barring the sale of

salacious material to children did not preclude the parent from purchasing it for their children. Here the school at state expense is making the book available to parents who may wish their children to read it.

deemed by the proper authorities to be without merit either as works of art or science, simply because they are not obscene within the statute. If someone authored a book advocating that the earth was flat, it could hardly be argued that the work could not be removed from the public school library unless it was also obscene. Appellants concede, or at least do not reject, the proposition that the Board has ultimate authority for the initial selection of the public school library collection. They suggest, however, that we have a different case where, as here, the book was once shelved and is now removed. They analogize the shelving and unshelving of a book to the constitutional right of a person to obtain public employment and his rights to retain such employment when it is sought to be terminated. This concept of a book acquiring tenure by shelving is indeed novel and unsupportable under any theory of constitutional law we can discover. It would seem clear to us that books which become obsolete or irrelevant or where improperly selected initially, for whatever reason, can be removed by the same authority which was empowered to make the selection in the first place.

Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) is equally far afield. There the court did intrude into the field of public education by invalidating a regulation of school principals which suspended students who wore black armbands to classes symbolizing their objection to hostilities in Vietnam. This was deemed a violation of their right to free speech under the first amendment in the absence of a showing that the conduct of the students materially disrupted classwork or involved substantial disorder or invasion of the rights of others. The appellant conveniently ignores the factual setting of *Tinker* but would have us apply its test. Since the shelving of *Down These Mean Streets* did not create any disruption or disorder, it is argued, it should remain on the shelf. There is here no problem of freedom of speech or the expression of opinions on the part of parents, teachers, students or librarians. As we have pointed out, the discussion of the book or the problems which it encompasses or the ideas it espouses have not been prohibited by the Board's action in removing the book.

The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept.[6]

Appellant finally urges upon us two cases Keefe v. Geanakos, 418 F.2d 359 (1st Cir.1969) and Parducci v. Rutland, 316 F.Supp. 352 (M.D.Ala.1970). Both of these cases involved high school teachers of junior and senior students who assigned material for outside reading which school officials found offensive and inappropriate. Upon a refusal to comply with the orders of school authorities to desist, the teachers were discharged. To the extent that these cases hold that first amendment rights have been violated whenever a district court disagrees with the judgment of

---

6. Other Supreme Court cases relied upon by appellants are inapposite. In Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) the court found unconstitutional an Arkansas statute requiring public school teachers to file annual affidavits listing all organizational affiliations without limitation for a five year retroactive period; in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct.

675, 17 L.Ed.2d 629 (1967) the court invalidated New York teacher oath and loyalty laws as vague and ambiguous. In contrast, there is no inhibition of extramural teacher or librarian association whatsoever in the case before us. If the Board ordered a list of all books read or owned by the staff, these cases might be in point.

school officials as to the propriety of material assigned by a teacher to students, we are not in accord.[7]  In any event, both cases involved the discharge of teachers with concomitant issues of procedural due process which are not present here and therefore the cases are not controlling.[8]

In view of the facts in the record before us and the controlling precedents, we find no constitutional infirmity in the resolutions of the Board.

Affirmed.

7. While the First Circuit has indicated that it does not "regret" its decision in Keefe v. Geanakos, *supra*, its enthusiasm for intrusion into academic issues seems to be lessening, see Mailloux v. Kiley, 436 F.2d 565, 566 (1st Cir. 1971) and Mailloux v. Kiley, 448 F.2d 1242 (1st Cir. 1971).

8. That the discharge of the teacher in Keefe v. Geanakos, *supra*, was a vital fact is apparent from its decision (418 F.2d at 362), when it emphasized this element to distinguish the facts from Parker v. Board of Educ., 237 F.Supp. 222 (D.Md.1965).  In that case the teacher was not discharged, but since he had no tenure, there was no obligation to renew his contract.  On this point the lower court was affirmed in 348 F.2d 464 (4th Cir. 1965) cert. denied, 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966).