David BICKNELL, by his guardian Donald Bicknell; Timothy Bicknell, by his guardian Donald Bicknell; Rodney Blacklock, by his guardian Martha Blacklock; Cheryl Brinkman, by her guardian Sonia Sears; David Carney by his guardian Donald Carney; Mitchell Davis, by his guardian Mickey Davis; Linda Farley, by her guardian Roger Farley; Timothy Lattrell, by his guardian Robert Lattrell; Lynn Ritchie, by her guardian Ruth Ritchie; Elizabeth A. Phillips; Ruth Orr; Patricia Rockwell; Donald Bicknell; J. Albert Tisbert; Dorothy Tisbert; and Right to Read Defense Committee of Vergennes

v.

VERGENNES UNION HIGH SCHOOL BOARD OF DIRECTORS; David Potter and Charles Memoe.

Civ. A. No. 78–223.

United States District Court,
D. Vermont.

Aug. 24, 1979.

---

Richard A. Axelrod, Gensburg & Axelrod, St. Johnsbury, Vt., for plaintiffs.

Anthony B. Lamb, Paul, Frank & Collins, Robert H. Erdmann, Dinse, Allen & Erdmann, Burlington, Vt., for defendants.

## OPINION AND ORDER

COFFRIN, District Judge.

The parties in this action brought, we assume, pursuant to 42 U.S.C. § 1983 as well as 28 U.S.C. § 1343, have placed before the court a controversy involving one of our most fundamental and most carefully guarded political rights—the right to freedom of speech. The court is asked to determine whether the administrators of a public school district may remove books from the shelves of a high school library, or restrict student access to books, on the basis of their personal opinions that the book is "vulgar," "obscene" or otherwise inappropriate for student readers. Plaintiffs contend that school administrators violate the free speech and due process rights of students, school librarians, and teachers when they make such decisions based solely on their personal opinions. The defendants contend, on the other hand, that the selection and removal of library books is within the range of discretion granted to school authorities and that the exercise of this discretion does not infringe the first amendment or fourteenth amendment rights of students or school employees. The case is presently before the court on the defendants' motion to dismiss.

█ For the purposes of this motion, the court accepts as admitted the well-pleaded material allegations of the complaint, and we construe those allegations liberally. 2A *Moore's Federal Practice* ¶ 12.08 (2d ed. 1975). Nevertheless, based on the arguments of counsel and their memoranda of law, and for the reasons given below, we find that plaintiffs have failed to state a claim upon which relief can be granted and we grant the defendants' motion.

## I. Factual Background

In spite of the complexity and depth of the political controversy that has surrounded this case, the legally relevant facts are straightforward. On August 10, 1977, after almost twelve months of controversy surrounding certain books in circulation at the Vergennes Union High School Library, the elected Board of Directors (the Board) of the High School adopted a formal, written "Library/Media Policy" pertaining to "the philosophy and procedure for operating and maintaining the school library." That promulgation, patterned after the "School Library Bill of Rights" approved by the American Association of School Librarians Board of Directors, contains a number of policy statements covering the objectives of the school library media center, and the "rights" and "responsibilities" of various persons connected with the library, as well as an outline of procedures and criteria for materials selection. The promulgation also contains a statement, entitled "Board Guidelines for Selection of Library Materials," setting forth criteria for materials selection and establishing a procedure for responding to citizen complaints about materials in the library collection. Despite a series of idealistic statements of library goals and policies, the August, 1977, promulgation hardly qualifies as a "library bill of rights" for students, teachers, or librarians. It does, however, repeatedly reaffirm the Board's decision to retain direct control over library acquisition and removal decisions. It states that it is the "right" of the members of the Board of Directors "[t]o adopt policy and procedure, consistent with statute and regulation—that they feel is in the best interests of students, parents, teachers and community." Policy at 2. The rights and responsibilities of professional personnel, on the other hand, are limited "in accordance with Board policy." *Id.*

The procedure for determining whether a book should be removed from the library also places final authority with the Board itself. The August, 1977, procedures provide that a parent or local citizen objecting to a book in the library may initiate a

review of the work by completing a form entitled "Citizen's Request for Professional Reconsideration of a Work," and submitting it to the High School Principal. The Principal must provide copies of the request to the librarian and Superintendent of Schools and must inform the Board of the request. The librarian must then review the request and submit a written report of "action taken" to the Board. Finally, the procedures provide that "unresolved issues shall be settled by a majority vote of the Board or its designees." Policy at 5.

In the spring of 1978 defendants employed the procedures outlined above in the review of two books: *The Wanderers*, by Richard Price and *Dog Day Afternoon*, by Patrick Mann. A complaint about *The Wanderers* was submitted by Harold Leach and on April 5, 1978, the Board passed a motion to remove the book from the school library "because it is obscene and vulgar." Mr. and Mrs. Kittridge Haven, Mr. and Mrs. James Parkinson and Mr. and Mrs. Harold Leach also filed a complaint about *Dog Day Afternoon*, asking that the book be removed from the library because of its "vulgar language" and "obscene material," and because it was "immoral, perverted" and portrayed "too much violence." At its April 5 meeting the Board voted not to remove the book from the library permanently, but to place it in the Principal's office pending creation of a special restricted shelf in the library.

Following these decisions, the Board also acted to restrict the professional discretion of the school librarian in the selection and acquisition of additional works for the library. At the April 5 meeting the Board voted to prohibit the librarian from purchasing any additional major fictional works until further vote of the Board. On July 12, 1978, the Board ordered that any book purchases other than those in the category of "Dorothy Canfield Fisher, science fiction and high interest-low vocabulary" be reviewed by the school administration with the assistance of the Board. For the purposes of our decision on this motion, the court assumes that the Board policies freezing major new purchases and screening most new acquisitions are still in effect.

Plaintiffs in this action include several students at Vergennes Union High School, minors who sue by their guardians; four parents of students at the high school; Elizabeth Phillips, the school librarian; Ruth Orr, a library employee; and the Right to Read Defense Committee of Vergennes, an unincorporated association organized to oppose restrictions on the school library collection. The complaint names as defendants the Vergennes Union High School Board of Directors; David Potter, the Superintendent of the school system; and Charles Memoe, the Principal of the high school.

## II. *Discussion*

Although the plaintiffs have not delineated precisely the constitutional bases of their challenge to defendants' actions, the court reads the complaint to raise five claims of constitutional infringement:

1. Defendants' removal of *The Wanderers* and *Dog Day Afternoon* from the library infringes the students' first amendment right to receive information.

2. By imposing a freeze on new library acquisitions and permanently screening all major acquisitions, defendants have impermissibly conditioned a government-created privilege and have thus violated the student plaintiffs' first amendment rights.

3. Defendants' book removal and library acquisition policies violate the students' rights under the district's own Library/Media Policy "to freely exercise their right to read and to free access to library materials" and thus infringe their rights to due process of law.

4. Defendants have violated the due process rights of the school librarians by creating and enforcing the August, 1977, reconsideration and removal policy and by freezing and screening new library acquisitions.

5. Defendants' actions have denied teachers at the high school their constitutional rights "by creating a repressive atmosphere where their right to freely

discuss literature has been chilled." *See* Complaint (filed September 28, 1978).

### A. *Students' Claims*

Plaintiffs' most serious arguments are those concerning the rights of the students. We begin with the observations that "the educational needs of a free people are of utmost importance," *East Hartford Education Association v. Board of Education,* 562 F.2d 838, 842 (2d Cir. 1977), and that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). We believe, along with the Supreme Court, that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative election.'" *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 512, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969), *quoting Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). A library is a vital institution in the continuing American struggle to create a society rich in freedom and variety of thought, broad in its understanding of diverse views and cultures and justifiably proud of its democratic institutions. The life and utility of a library are severely impaired whenever works can be removed merely because they are offensive to the personal, political or social tastes of individual citizens, whether or not those citizens represent the majority of opinion in a community.[1] To this extent we agree with the arguments presented by plaintiffs herein.

 Nevertheless, we cannot agree with plaintiffs' legal conclusions; what is desirable as a matter of policy is not necessarily commanded as a matter of constitutional law:

By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.

*Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (footnote omitted). Although the court does not entirely agree with the policies and actions of the defendants we do not find that those policies and actions directly or sharply infringe upon the basic constitutional rights of the students of Vergennes Union High School.

In making this determination we are required as a lower court to accept the law found in a Second Circuit case strikingly similar to the one at bar. In *Presidents Council, District 25 v. Community School Board No. 25,* 457 F.2d 289 (2d Cir.), *cert. denied,* 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), the court of appeals reviewed a school board's decision to restrict junior high school students' access to the book *Down These Mean Streets* in their school libraries. Observing that New York state law placed responsibility for the selection of materials in public school libraries with local school boards, the court reasoned that:

some authorized person or body has to make a determination as to what the library collection will be. It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent. The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions.

*Presidents Council,* 457 F.2d at 291–92.

Plaintiffs have urged upon this court allegedly critical distinctions between the situation in *Presidents Council* and the case at bar. We do not find any of them constitutionally meaningful. Plaintiffs admit that in Vermont, as in New York, local school

---

1. Unfortunately, this is not an isolated problem. *See* King, "Censorship of Textbooks Is Found on Rise in Schools Around Nation," N.Y. Times, Mar. 27, 1979 at B15, Col. 1.

boards are by statute afforded considerable authority and discretion with respect to the administration of the schools, including the acquisition and use of materials for school library collections.[2] Moreover, we do not find the difference in the ages of the students involved in the two cases to be critical in determining this issue. Finally, contrary to plaintiffs' assertions, *Presidents Council* does not hold that school authorities must base their decision to purchase or remove a book on articulable educational grounds. To the contrary, the court of appeals stated that it was not appropriate for the federal courts "to review either the wisdom or efficacy of the determinations of the Board," and concluded, "[t]o suggest that the shelving or unshelving of books presents a constitutional issue . . . is a proposition we cannot accept." *Id.* at 291 (footnote omitted).

■ The court is aware that two other courts that have reviewed similar public school library controversies have not followed and have sought to distinguish the Second Circuit's decision in *Presidents Council. Minarcini v. Strongsville City School District,* 541 F.2d 577 (6th Cir. 1976); *Right to Read Defense Committee v. School Committee,* 454 F.Supp. 703 (D.Mass.1978). Those cases hold that although a school board can determine what books will go into a library, and may even determine whether to create a library at all, it may not exercise the same wide discretion in removing works from the shelves after they are purchased: "[o]nce having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members." *Minarcini,* 541 F.2d at 582. Whatever merit there may be in such constitutional analysis, it is not the rule we are bound to follow in this circuit. The court of appeals explicitly addressed this argument in *Presidents Council,* holding, "[t]his concept of a book acquiring tenure by shelving is indeed novel and unsupportable under any theory of constitutional law we can discover." *Presidents Council,* 457 F.2d at 293.[3]

■ Plaintiffs urge the court to find that the underlying premises of *Presidents Council* have been altered by the Supreme Court's recent decisions on the first amendment right to receive information. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). We are not persuaded by this line of argument. The right to receive information in the free speech context is merely the reciprocal of the right of the speaker. *See Virginia Board of Pharmacy,* 425 U.S. at 757, 96 S.Ct. at 1823 ("If there is a right to adver-

---

**2.** Vt.Stat.Ann. tit. 16, § 563 defines the powers of school boards, which include authority to:

(1) Determine the educational policies of the school district, and prescribe rules and regulations for the conduct and management of the public schools in the district. . . .

(2) . . . take any action, which is required for the sound administration of the school district. . . .

(14) Provide, at the expense of the district, subject to the approval of the superintendent, all text books, learning materials, equipment and supplies.

(15) Exercise the general powers given to a legislative branch of a municipality.

*Id.* By virtue of Vt.Stat.Ann. tit. 16, § 701(a), the powers afforded the school boards of other school districts are also afforded the school boards of union school districts.

The scope of authority granted Vermont school boards is comparable to that granted to school boards in New York and at issue in *Presidents Council. Presidents Council,* 457 F.2d at 290 n. 1. *See* N.Y.Educ.Law c. 16, § 2590–e(3) (McKinney 1970).

**3.** Plaintiffs attempt to avoid this holding by claiming that the school board's discretion is *equally restricted* with respect to both acquisition and retention decisions: "Plaintiffs submit that Defendants' authority and discretion with respect to the selection of books for the library is no broader than its authority and discretion with respect to the removal of books contained therein." (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 16 n. 8 (filed Nov. 12, 1978)). We find no merit in the argument that a school board must articulate an educationally related reason for refusing to purchase any one of the thousands of works that might be desired by a student, parent or other person interested in the school library.

tise, there is a reciprocal right to receive the advertising . . . ."). Plaintiffs do not contend, nor could they reasonably argue, that the publishers of certain works have a constitutionally protected right to have their works purchased by the Vergennes Union High School Library or retained on the open shelves after purchase. The students' right to review those works through the school library, expressed as the constitutional right to receive information, is no broader. Finally, we note that there has been neither evidence nor argument in this case that the Board's actions have in fact abridged the student plaintiffs' constitutional rights of free expression. Students remain free to purchase the books in question from private bookstores, to read them in other libraries, to carry them to school and to discuss them freely during the school day. Neither the Board's failure to purchase a work nor its decision to remove or restrict access to a work in the school library violate the first amendment rights of the student plaintiffs before this court.[4]

▮ The student plaintiffs' final claim is that the Board's disputed book acquisition and removal policies violate rights guaranteed them by the district's Library/Media Policy "to freely exercise their right to read and to free access to library materials," and thus violate the due process clause of the fourteenth amendment. The protections of the due process clause extend only to bona fide liberty or property interests created by federal or state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Since we have found no independent constitutional right to the library policies plaintiffs advocate their due process claim rests

on state law alone, and ultimately on the words of the high school's Library/Media Policy. Reading that promulgation in its entirety, the court is unable to find a violation of plaintiffs' rights by the Board. As stated above, the Policy repeatedly reasserts the primacy of the Board itself in the operation of the school library. It also sets forth in detail the process for removing from the collection, a process which plaintiffs do not even claim to have been violated by the Board. If we were to impute such legal content to the high-minded phrases of the "library bill of rights," those general phrases would effectively nullify the specific procedures outlined in the same promulgation. Well-developed rules of statutory construction, as well as common sense, require us to read as a whole the Library/Media Policy and its procedures. Viewing it in its entirety, the court does not find that it creates any "right to read" or "right of access" to library books apart from those rights secured by statute and constitutional law. The student plaintiffs' due process claim must therefore fail.

### B. *School Employees' Claims*

▮ We turn now to the claims of the school employees. Since the complaint and supporting papers do not precisely delineate the constitutional claims raised by the high school's library employees, the court assumes that they intend to join in the students' first amendment protest of the Board's book removal policies. *Presidents Council* also forecloses this claim. In that case, upon consideration of the claims of students, parents, parent-teacher associations, teachers and librarians the Second Circuit held that "[t]he intrusion of the Board here upon any first amendment con-

---

4. For these reasons we also reject the conclusory argument in the complaint that the defendants' actions "have denied teachers at the High School their Federal and State constitutional rights by creating a repressive atmosphere where their right to freely discuss literature has been chilled." Complaint at 6 (filed Sept. 28, 1978). The complaint contains no specific allegation concerning any restriction on the expression of opinion by anyone in the school. Although some teachers may be members of the plaintiff committee, there is no allegation to that effect, nor is any teacher a named plaintiff.

In these circumstances we believe that the plaintiff has an obligation to plead specific acts by which the defendants allegedly deprived them of their constitutional rights. "Complaints relying on the civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions." *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir. 1976) (citations omitted). *See also Ostrer v. Aronwald,* 567 F.2d 551 (2d Cir. 1977).

stitutional right of any category of plaintiffs is not only not 'sharp' or 'direct', it is miniscule." *Presidents Council,* 457 F.2d at 292. Nor do we believe that school librarians have an independent first amendment right to control the collection of the school library under the rubric of academic freedom. The selection of works for the library is a curricular rather than a methodological matter, and "public secondary school boards have considerable discretion as to the substantive content" of the curriculum. *East Hartford Education Association v. Board of Education,* 562 F.2d 838, 843 (2d Cir. 1977).[5]

Plaintiffs next argue that the Board's removal of *The Wanderers* from the collection, the imposition of restrictions on *Dog Day Afternoon* and the Board's policy of screening all new major fictional additions to the collection violate the librarians' rights under the Library/Media Policy to "freely select" the media collection for the high school library. This claim is similarly unavailing. As we have pointed out above, the promulgation must be read in its entirety, and the detailed procedures set forth for removing works from the collection obviously condition the general statements of the rights of those persons affected by the Policy. Furthermore, the rights of professional personnel under that Policy "to freely select" materials for the collection are explicitly limited by the phrase "in accordance with Board policy." Policy at 2. Under the heading "Procedures for Materials Selection" the Policy states: "In selecting materials for purchase the media specialist . . . . 5. Selects materials consistent with Board policy." Policy at 3. In addition, the "Criteria for Materials Selection" explicitly includes that they are to be considered on the basis of "consistency with Board Guidelines," Policy at 3, and the Board Guidelines that follow conclude with the statement that "[u]nresolved issues shall be settled by a majority vote of the

Board or its designees." Policy at 5. The court finds nothing in the Board's Library/Media Policy to restrict the Board's prerogatives under state statute to control strictly and closely the collection of the high school library. The Board may exercise that authority by reviewing individual works, by screening all proposed additions to the collection, or by prohibiting new additions to the library altogether. Since the defendants' actions are consistent with the Board's policy and procedural promulgations, there has been no violation of the plaintiffs' due process rights.

For the foregoing reasons, the court grants the defendants' motion to dismiss. As the plaintiffs are not prevailing parties, their motion for attorney's fees under 42 U.S.C. § 1988 is hereby denied. The parties will bear their own costs.

So ORDERED.

---

5. In the absence of any cognizable constitutional claim it is not for this court to say whether the ultimate responsibility for the selection, acquisition and removal of books more appropriately should rest with the Board or the school librarian. We cannot assume that librarians are naturally more vigilant protectors of constitutional liberties than school board members.

Nor can we accept the argument, implicitly made by plaintiffs here, that a decision to select or remove a work is constitutionally suspect when made by a school board but not suspect when based on the professional discretion or personal judgment of a library employee. There is no constitutional basis for making such a distinction.