Brooke ZYKAN, by her next friends, Anthony and Jacqueline Zykan, and Blair Zykan, Plaintiffs-Appellants,

v.

WARSAW COMMUNITY SCHOOL CORPORATION, and Warsaw School Board of Trustees; William I. Chapel, Jerry C. Deeter, Wayne Bouse, Marie C. Stokes, Max M. Anglin, William M. Dalton II, and Ralph E. Coplen; and their successors in office, in their individual and official capacities, Defendants-Appellees.

No. 80–1038.

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1980.

Decided Aug. 22, 1980.

Joseph P. Bauer, Notre Dame, Ind., for plaintiffs-appellants.

Donald R. Anderson, Bose & Evans, Indianapolis, Ind., for defendants-appellees.

Before SWYGERT and CUMMINGS, Circuit Judges, and NICHOLS, Associate Judge.[*]

CUMMINGS, Circuit Judge.

Plaintiff Brooke Zykan, a Warsaw, Indiana high school student suing by her parents and next friends, Anthony and Jacqueline Zykan, and plaintiff Blair Zykan, a former Warsaw high school student, field this action under Section 1983 of the Civil Rights Act, alleging violations of their First and Fourteenth Amendment rights by defendants Warsaw Community School Corporation, the Warsaw School Board of Trustees, and six individual members of that Board. In their initial complaint filed on March 21, 1979, plaintiffs sought certification as a class to contest various curriculum-related decisions made by the Board and several of its present and former employees, including Charles Bragg, the Superintendent of Schools, William Goshert, former Assistant Superintendent, and C. J. Smith, former principal of Warsaw High School. Plaintiffs filed an amended complaint on April 6, 1979. On June 18, defendants asked that the district court dismiss the amended complaint for failure to state a claim for relief or for lack of subject matter jurisdiction, or, in the alternative, that it abstain pending resolution of certain state law issues or grant summary judgment on their behalf. On December 3, 1979, the district court dismissed the amended complaint for lack of subject matter jurisdiction, and this appeal followed. We agree that the complaint must be dis-

[*] The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

missed, but vacate the district court order and remand with instructions to grant plaintiffs leave to amend.

This case arises from a series of decisions made in 1977 and 1978 by the defendant School Board and its various members and employees primarily regarding the English curriculum at Warsaw High School, the use of certain books in that curriculum, and the rehiring of teachers for English courses. The amended complaint essentially concerns six incidents that, when viewed together, are said by plaintiffs to amount to violations of their First and Fourteenth Amendment rights.[1] The first four of these incidents involve the removal of books from certain courses and the school library. They include:

1) that defendants ordered the removal from the school premises and the destruction of the textbook *Values Clarification*[2] and did so "without proper consultation with teachers, parents or students and without taking adequate steps to determine the literary and scholastic value of the text  *  *  *" (par. 17);

2) that former principal Smith told English teacher Teresa Burnau to return to the publisher one book[3] she had planned to use in her course "Women in Literature" and not to use three others[4] (pars. 21, 22);

3) that defendants promulgated a policy prohibiting the use of reading materials that " 'might be objectionable' " and that as a consequence of this policy, Smith required a teacher to excise certain portions of *Student Critic*, a book long in use in the high school[5] (pars. 23–26);

4) that defendants have permanently removed the book *Go Ask Alice* from the school library (pars. 27–29).[6]

Plaintiffs allege that defendants took these actions because "  *  *  * particular words in the books offended their social, political and moral tastes and not because the books, taken as a whole, were lacking in educational value" (par. 32). They also assert that in each case defendants acted in defiance of the "Croft Policy," which, they say, established the regular procedure for handling censorship decisions.

The amended complaint also charges defendants with eliminating seven courses from the high school curriculum "because the teaching methods and/or content of the courses offended their social, political and moral beliefs" (par. 34). Plaintiffs once again allege that defendants took this action without compliance with the Croft Policy. A final set of allegations concerns defendants' decision not to rehire English teacher Teresa Burnau and another teacher, which plaintiffs contend has deprived them "of the opportunity to learn from and asso-

---

1. We must of course accept as true the well-pleaded allegations of the complaint. The amended complaint now in the record was filed a fortnight after the initial complaint as a matter of course. See Rule 15(a) of the Federal Rules of Civil Procedure.

2. The amended complaint alleges that defendants eventually granted a request that they convey the books to a local senior citizens group for a public burning. This contemptible ceremony, which has greatly animated the discussion of this case by the *amici curiae*, took place in December 1977. No self-respecting citizen with a knowledge of history can look upon this incident with equanimity, but its relationship to the legal issues in this case is tenuous at best. Its only arguable relevance is as evidence of the purposes of the School Board and its agents in making the educational decisions at issue here. As discussed at length below, we do not regard the allegations with respect to these purposes as sufficient to state

a constitutional claim, and the book-burning incident requires no change in this conclusion.

3. *Growing Up Female In America.*

4. *Go Ask Alice; The Bell Jar; The Stepford Wives.* There is no suggestion that any of the disputed books is obscene.

5. Defendants' account of this incident is somewhat different, but as noted, we must accept as true the allegations of plaintiffs' complaint.

6. This book, which it should be noted was one of the books eliminated from the "Women in Literature" course, was, according to defendants, checked out of the library to be used in some related litigation spawned by the incidents at issue here. Defendants have promised to return the book when that litigation is completed. For purposes of our consideration, we will view the book as simply eliminated from the library collection.

ciate with these capable teachers" and has created an "atmosphere of tension and fear among present teachers * * * resulting in a diminution or loss of academic freedom on the part of all teachers and students in the District" (pars. 35–37). Plaintiffs' factual allegations conclude with the assertions that plaintiff Blair Zykan's "right to know was directly violated by defendants' actions, which capriciously and unreasonably infringed upon his right to read literary works in their entirety," that plaintiff Brooke Zykan suffers directly from defendants' "capricious and arbitrary actions in censoring courses and books" (par. 38), and finally that defendants' actions have had and continue to have "a chilling effect on the free exchange of knowledge" in the Warsaw schools (par. 39).

In addition to requesting class certification to represent all former, present and future students at Warsaw High School, plaintiffs sought, *inter alia*, declaratory relief adjudging defendants' conduct in violation of the First and Fourteenth Amendments, an injunction ordering the restoration to the curriculum of the discontinued books, and an order directing the reversal of all curriculum changes. They also requested an order restraining defendants from further changing the school curriculum and reading materials "until a reasonable and impartial procedure * * * has been formulated and * * * complied with" and from interfering with "reasonable" selections of course materials by teachers or access to such materials by students. As noted, defendants opposed the complaint with a variety of motions, including one to dismiss the complaint for lack of subject matter jurisdiction.

On December 3, Judge Sharp granted the motion to dismiss on the ground that he lacked jurisdiction over the subject matter. He concluded that the "complaint fail[ed] to allege a violation of either the First Amendment's guarantee of religious freedom or the First Amendment's guarantee of a right to receive a constitutionally pro-

tected communication." (R. Item 17 at 3). He found that the precedents of this Circuit have otherwise placed few constitutional constraints on the exercise of discretion by school officials. In particular he stated that:

> "the function of school officials is not constitutionally restricted to determining the most efficient method of exposing students to as many facts and opinions as possible; rather, it is legitimate for school officials to develop an opinion about what type of citizens are good citizens, to determine what curriculum and material will best develop good citizens, and to prohibit the use of texts, remove library books, and delete courses from the curriculum as a part of the effort to shape students into good citizens. *See Ambach v. Norwick*, [441 U.S. 68], 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). And there is no way for school officials to make the determinations involved except on the basis of personal moral beliefs. To allege that school officials have made decisions regarding classroom texts, library books, and curriculum courses solely on the basis of personal 'social, political, and moral' beliefs is insufficient to allege a violation of constitutionally protected 'academic freedom.'" (R. Item 17 at 4.)

*This Case Is Not Moot*

Defendants argue in their brief that this case should be dismissed as moot. They note that Indiana law requires local school boards to select new textbooks every five years and that pursuant to this directive, the Warsaw Board adopted in 1978 an entirely new English curriculum in which the course offerings are more traditional and the disputed books have no place.[7] They assert that the factual allegations of the complaint did not challenge the decision to adopt this new curriculum and therefore that the administrative action subsequent to the incidents at issue here has rendered the relief sought by plaintiffs inappropriate.

7. According to the defendants, "Women in Literature" and the other discontinued courses were a part of the experimental "Apex" curriculum which replaced the standard curriculum with a series of "mini-courses" on selected topics. Periodic review of the English curriculum resulted in the discontinuance of the Apex program in favor of a more traditional format.

The short answer to defendants' argument is that both the facts alleged and relief sought in the complaint easily survive the Board's change in curriculum. For example, plaintiffs have alleged that a book has been improperly removed from the library and not returned and that teachers have not been rehired for improper motives. These actions and others are said to have had a chilling effect on academic freedom and to have caused harm to one plaintiff and to be causing harm to another. Further, the relief sought by plaintiffs plainly reaches beyond the specific incidents alleged, for plaintiffs have sought an injunction requiring defendants to adopt and comply with impartial procedures for implementing curriculum changes. Plaintiffs clearly argue that they have suffered a legal injury greater than the sum of the specific factual allegations involved, and defendants have cited no authority for their assertion that in such a context plaintiffs' broad claims for relief must be narrowed to correspond to the specific facts alleged. At the same time, plaintiffs' request for relief is sufficiently broad to cover even the legislatively-sanctioned decision to revise the high school English curriculum. Accordingly, plaintiffs' complaint is not moot.

*Failure to State a Constitutional Claim*

Nevertheless, plaintiffs' complaint does not state a violation of constitutional rights and therefore is not cognizable in federal court under Civil Rights Act Section 1983 and Section 1343 of the Judicial Code. This conclusion stems from a careful consideration of the competing interests presented by a complaint charging infringement of students' academic freedom. It is now settled of course that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed. 2d 731. It is also clear that in line with such concepts as the "marketplace of ideas" the First Amendment guarantees are sufficiently broad to provide some protection for what has been called "academic freedom," which recognizes the importance to the scholarly and academic communities of being free from ideological coercion. *Healey v. James*, 408 U.S. 169, 180–181, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266, *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972), certiorari denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695; see also *Developments In The Law—Academic Freedom*, 81 Harv.L.Rev. 1045 (1968). Less clear are the precise contours of this constitutionally protected academic freedom, and particularly its appropriate role when the concern is not the rarified atmosphere of the college or university, but rather the heartier environment of the secondary school.

Secondary school students certainly retain an interest in some freedom of the classroom, if only through the qualified "freedom to hear" that has lately emerged as a constitutional concept. See *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346. But two factors tend to limit the relevance of "academic freedom" at the secondary school level. First, the student's right to and need for such freedom is bounded by the level of his or her intellectual development. A high school student's lack of the intellectual skills necessary for taking full advantage of the marketplace of ideas engenders a correspondingly greater need for direction and guidance from those better equipped by experience and reflection to make critical educational choices. Second, the importance of secondary schools in the development of intellectual faculties is only one part of a broad formative role encompassing the encouragement and nurturing of those fundamental social, political, and moral values that will permit a student to take his place in the community. *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49; *James v. Board of Education*, 461 F.2d 566, 573 (2d Cir. 1972), certiorari denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491. As a result, the community has a legitimate, even a vital and compelling interest in "the choice [of] and adherence to a suitable curriculum for the benefit of our young citizens * * *." *Palmer v. Board of Education*, 603 F.2d 1271, 1274 (7th Cir. 1979), certiorari denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659.

The need for intellectual and moral guidance from a body capable of transmitting the mores of the community has led most state legislatures to lodge primary responsibility for secondary school education in local school boards, which generally have considerable authority to regulate the specifics of the classroom. In accordance with these principles, Indiana, pursuant to statute, has entrusted the governance of secondary school education to such local boards (Ind. Code 20–4–1–8) who have nearly plenary powers concerning curriculum, textbooks and other educational matters (Ind.Code 20–5–2–1; 20–5–2–2; see also Ind.Code 20–10.1–4–4). The breadth of these powers in part reflects the perception that at the secondary school level the need for educational guidance predominates over many of the rights and interests comprised by "academic freedom." The Supreme Court itself has sanctioned this balance of interests, noting that

> "[b]y and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not *directly and sharply* implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (emphasis supplied).

Virtually every judicial body that has commented on the matter has acknowledged the need for broad discretionary powers in local school boards. *E. g. Cary v. Board of Education*, 598 F.2d 535 (10th Cir. 1979); *East Hartford Education Assn. v. Board of Education*, 562 F.2d 838 (2d Cir. 1977) (*en banc*); *Minarcini v. Strongsville City School District*, 541 F.2d 577 (6th Cir. 1976); *Presidents Council, District 25 v. Community School Board*, 457 F.2d 289 (2d Cir. 1972), certiorari denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260, *James v. Board of Education*, 461 F.2d 566 (2d Cir. 1972), certiorari denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491; *Pico v. Board of Education*, 474 F.Supp. 387 (E.D. N.Y.1979); *Right to Read Defense Committee of Chelsea v. School Committee of Chelsea*, 454 F.Supp. 703 (D.Mass.1978); *Mercer v. Michigan*

*State Board of Education*, 379 F.Supp. 580 (E.D.Mich.1974), affirmed, 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678; *Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala.1970); see also *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49; *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.

This grant of broad discretion specifically means that there are only limited constitutional constraints on the form and content of decisions of local school boards acting within the bounds of their statutory powers. Educational decisions necessarily involve choices regarding what students should read and hear, and particularly in light of the formative purpose of secondary school education, local discretion thus means the freedom to form an opinion regarding the instructional content that will best transmit the basic values of the community. As a result, it is in general permissible and appropriate for local boards to make educational decisions based upon their personal social, political and moral views. *Cary v. Board of Education*, 598 F.2d 535, 544 (10th Cir. 1979).

■ To be sure, the discretion lodged in local school boards is not completely unfettered by constitutional considerations. Control of matters not immediately affecting classroom activities is subject to numerous qualifications. See *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; *Thomas v. Board of Education*, 607 F.2d 1043 (2d Cir. 1979), certiorari denied *sub nom., Granville Central School District v. Thomas*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765. In the classroom there are recognized limits on local control of educational matters. School boards are for example not free to fire teachers for every random comment in the classroom. See, *e. g., Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657 (S.D.Tex. 1972). In the case of the students themselves, local school boards must respect certain strictures that for example bar them from insisting upon instruction in a religiously-inspired dogma to the exclusion of all other points of view (*Epperson v. Arkan-*

sas, supra), or from placing a flat prohibition on the mention of certain relevant topics in the classroom (but see Mercer v. Michigan State Board of Education, 379 F.Supp. 580 (E.D.Mich.1974), affirmed, 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678), or from forbidding students to take an interest in subjects not directly covered by the regular curriculum. At the very least, academic freedom at the secondary school level precludes a local board from imposing "a pall of orthodoxy" on the offerings of the classroom (Keyishian v. Board of Regents, 385 U.S. 589, 602, 87 S.Ct. 675, 683, 17 L.Ed.2d 629), which might either implicate the state in the propagation of an identifiable religious creed or otherwise impair permanently the student's ability to investigate matters that arise in the natural course of intellectual inquiry.

From these principles derives the rule that complaints filed by secondary school students to contest the educational decisions of local authorities are sometimes cognizable but generally must cross a relatively high threshold before entering upon the field of a constitutional claim suitable for federal court litigation. Such a balance of legal interests means that panels such as the Warsaw School Board will be permitted to make even ill advised and imprudent decisions without the risk of judicial interference. Nothing in these principles suggests that the courts should condone shortsighted board decision-making. But nothing in the Constitution permits the courts to interfere with local educational discretion until local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute. A reading of the amended complaint confirms that these plaintiffs have failed to allege sufficient facts regarding such a flagrant abuse of discretion by defendants to justify intervention by this Court at this point.

First, some of the allegations seem too ephemeral when measured against the gravity of these constitutional concerns. Thus plaintiff Blair Zykan's summary assertion that defendants "capriciously and unreasonably infringed upon his right to read

literary works in their entirety" posits an interference with a right of uncertain constitutional genealogy. Second, plaintiffs' more cogent allegations with respect to the removal of Values Clarification from one course, the deletion of certain materials from the "Women in Literature" course, the excision of "objectionable" parts of a textbook, and even the discontinuance of certain courses simply do not rise to the level of a constitutional claim. Cf. Arundar v. DeKalb County School District, 620 F.2d 493 (5th Cir. 1980) (finding no due process right to enroll in classes of a certain content). The amended complaint nowhere suggests that in taking these actions defendants have been guided by an interest in imposing some religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally.

Plaintiffs' assertions that the decisions of the Board and its employees have stemmed from their social, political and moral tastes and not from educational criteria suggest a constitutional analysis based on the very facile categorization that the principles expressed above should foreclose. The Constitution neither disparages the application of social, political and moral tastes to secondary school educational decisions nor specifies that such criteria are irrelevant or alien to the legitimate exercise of educational choice. Noticeably absent from the amended complaint is any hint that the decisions of these administrators flow from some rigid and uniform view of the sort the Constitution makes unacceptable as a basis for educational decision-making or from some systematic effort to exclude a particular type of thought, or even from some identifiable ideological preference. Plaintiffs have also not alleged that the Board's decisions have deprived them of all contact with the material in question by, for example, forbidding students to have or to read the materials or making them wholly unavailable to them from other sources. See Minarcini v. Strongsville City School District, supra at 583–584; Bicknell v. Vergennes Union High School Board of Directors, 475 F.Supp. 615, 621 (D.Vt.1979).

As for the Croft Policy that defendants are alleged to have defied, the text of its

procedures, which plaintiffs have affixed to both their complaints, belies any suggestion that the channel it offers to the public for voicing displeasure with curricular decisions made by the Board constitutes an established constraint on the Board's own exercise of its powers. In addition, it is highly questionable whether, even if construed as applicable to the Board, these informal procedures, which presumably do not have the force of law, could achieve the status of a constitutionally enforced due process restraint on Board action, particularly given the freedom school boards traditionally have in electing how to make their decisions. At the same time, plaintiffs' complaint lacks any allegation that the Board exceeded its statutory powers, failed to act consistently with them,[8] or improperly delegated responsibilities to others. Plaintiffs have also not alleged that the various employees acted beyond the authority properly granted to them by the Board.

■ Plaintiffs' allegations regarding teacher hiring decisions are creative but no more availing. On the one hand, if these allegations are construed to contest directly the motives and procedures surrounding the Board's decision not to rehire two teachers, they would engender serious standing problems. If colorable, such claims are properly litigated not by the students, whose injury is highly attenuated, but by the teachers who have suffered the harm. Accordingly, the teachers involved in this case have apparently filed actions in the appropriate forum.[9] On the other hand, plaintiffs cannot successfully circumvent this difficulty merely by couching their vague interests in such lofty First Amendment phrases as the right of association, or by appealing to the asserted right to have the teachers control

the classroom. It has been generally recognized that secondary school teachers occupy a unique position for influencing secondary school students (*Ambach v. Norwick*, 441 U.S. at 78–80, 99 S.Ct. at 1595–96), an observation that has given rise to a concomitant power on the part of local authorities to choose the teachers (*id.*), regulate their pedagogical methods (*Hetrick v. Martin*, 480 F.2d 705, 709 (6th Cir. 1973), certiorari denied, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482), and establish basic standards for what they will teach. *Palmer v. Board of Education*, 603 F.2d 1271, 1274 (7th Cir. 1979), certiorari denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659; *Cary v. Board of Education*, 598 F.2d 535, 543 (10th Cir. 1979); *East Hartford Education Assn. v. Board of Education*, 562 F.2d 838, 859 (2d Cir. 1977) (*en banc*); *James v. Board of Education*, 461 F.2d 566, 575 (2d Cir. 1972), certiorari denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491; *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), certiorari denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695; *Ahern v. Board of Education*, 456 F.2d 399, 403–404 (8th Cir. 1970); *Mercer v. Michigan State Board of Education*, 379 F.Supp. 580, 585 (E.D.Mich.1974), affirmed, 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678. *Contra, Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969); but see *Mailloux v. Kiley*, 436 F.2d 565, 566 (1st Cir. 1971) and *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971) (seemingly limiting *Geanakos* to its facts).

■ It is difficult to conceive how a student may assert a right to have the teacher control the classroom when the teacher herself does not have such a right. As a result, whatever rights secondary school students may have outside the classroom to meet and discuss with a particular teacher, their asso-

8. There is no need to linger over plaintiffs' assertions that the School Board and its employees have made decisions "capriciously," "arbitrarily," or "unreasonably." Read in context, these allegations plainly refer to the use of social, political and moral judgments in making curriculum decisions. As noted above, decisions based on such judgments are neither capricious nor arbitrary nor unreasonable. Furthermore, nothing in the School Board's statutory authority requires it to make its decisions according to some formal procedure and we do not regard the Constitution as imposing such a requirement.

9. According to defendants (Br. at 9 n. 16), the two teachers brought suit in the district court against the Warsaw School Board, contesting their terminations. In one instance the court entered judgment for the defendants. The second case has now apparently proceeded through the trial stage, but the parties have not informed this Court of the outcome.

ciational interests do not afford them a right to be taught in the classroom by that instructor or in accordance with that teacher's own sense of the best material. *Pico v. Board of Education*, 474 F.Supp. at 397–398. A student's appreciation of a teacher's skills simply does not invest a teacher with a constitutionally-based tenure when the actions of the school board have given that teacher none. Of course, it is possible that failure to rehire a particular teacher may further evidence an attempt by the local board to impose an identifiable orthodoxy, thereby fueling plaintiffs' case for specific curricular relief without raising directly a teacher's own claim to reinstatement. But again this amended complaint is inadequate to support such a theory, for it suggests nothing more than the allowable application by the local board of its preferences in the choice of formative models for local schooling.

■ Our basic principles for handling academic freedom claims by secondary school students would seem to dispose as well of the claim regarding the removal of one book from the school library. The amended complaint does not allege that the book has been made completely unavailable to plaintiffs, that students are prohibited from discussing its contents in school, or even that the removal was part of an action to cleanse the library of materials conflicting with the School Board's orthodoxy. Nevertheless at least three courts have held that once a book has been offered as part of the school library collection, school authorities may not remove it because they object to its content. *Minarcini v. Strongsville City School District*, 541 F.2d 577 (6th Cir. 1976); *Salvail v. Nashua Board of Education*, 469 F.Supp. 1269 (D.N.H.1979); *Right to Read Defense Committee of Chelsea v. School Committee of Chelsea*, 454 F.Supp. 703 (D.Mass.1978). However, there is substantial authority on the other side (*Presidents Council, District 25 v. Community School Board*, 457 F.2d 289 (2d Cir. 1972), certiorari denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260; see also *Bicknell v. Vergennes Union High School Board of Directors*, 475 F.Supp. 615 (D.Vt.1979); *Pico v. Board of Education*, 474 F.Supp. 387

(E.D.N.Y.1979)), and we join with these courts in rejecting the suggestion that a particular book can gain a kind of tenure on the shelf merely because the administrators voice some objections to its contents.

To be sure, a library is a general resource the purpose of which is to foster intellectual curiosity and serve the intellectual needs of its users. *Minarcini v. Strongsville City School District, supra* at 582; *Bicknell v. Vergennes Union High School Board of Directors, supra* at 619. But such sentiments should not obscure practical realities. School libraries are small auxiliary facilities often run on limited budgets. *Pico v. Board of Education, supra* at 397. They must, despite their limitations, cater to the needs of an often diverse student body, primarily by providing materials that properly supplement the basic readings assigned through the standard curriculum. An administrator would be irresponsible if he or she failed to monitor closely the contents of the library and did not remove a book when an appraisal of its content fails to justify its continued use of valuable shelf space. See *Presidents Council, District 25 v. Community School Board, supra* at 291–293; *Pico v. Board of Education, supra* at 396.

This is not to say that an administrator may remove a book from the library as part of a purge of all material offensive to a single, exclusive perception of the way of the world, anymore than he or she may originally stock the library on this basis. Nor can school authorities prohibit students from buying or reading a particular book or, under most circumstances, from bringing it to school and discussing it there. But no such allegations appear in plaintiffs' pleading, which only recites the aforementioned phrase regarding defendants' reliance on their personal moral, political and social judgment in removing the book. See note 2 *supra*. Accordingly, we agree with Judge Sharp that the amended complaint has failed in all its particulars as well as its overall tenor to allege a constitutional violation from which subject matter jurisdiction may be drawn.

Nevertheless, the articulation of the principles at issue here is sufficiently novel and important that plaintiffs should be given

leave to amend their complaint again, if they can, to allege the kind of interference with secondary school academic freedom that has been found to be cognizable as a constitutional claim. This leave is of course without prejudice to the defenses and motions defendants have raised in response to the present amended complaint.[10]

Judgment vacated and remanded with instructions; Rule 18 to apply; costs to defendants.

SWYGERT, Circuit Judge, concurring in the judgment in part.

I concur only in the result that the judgment of dismissal should be vacated and that the case should be remanded for further proceedings under Circuit Rule 18. Other than that, I must with deference, but in all candor, disassociate myself from the approach taken by Judge Cummings.

The Federal Rules of Civil Procedure establishes a "notice" system of pleading in the federal courts. A party is required in the first instance only to plead "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and is not limited to reliance on the legal theory of relief originally pleaded. 2A Moore's Federal Practice ¶ 8.14 (2d ed. 1979). A judgment of dismissal under Rule 12(b) should not be granted "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." 2A Moore's Federal Practice ¶ 8.13, at 118–19 (2d ed. 1979).

In the case at bar the district court improperly considered plaintiffs' main legal theory—that the Board violated the Constitution by acting on the basis of their personal, moral, political, and social, but not religious beliefs—to the complete exclusion of other legal theories presented by the complaint. The plaintiffs also alleged, for instance, "unreasonable censorship . . . that unduly burdens the freedom of protected classroom discussion." Complaint ¶ 39. That allegation, when considered with the nature of the specific books allegedly excised, many of which appear to deal with feminism, is sufficient in my view to withstand a motion to dismiss even under the substantive standard adopted by the majority: the censoring of a number of books on the same subject states a claim, for purposes of pleading, that the Board's actions suppressed "a particular kind of inquiry generally." Although I do not think that further amendment of the complaint is necessary, any problem in the pleading will likely be resolved on remand since counsel for plaintiffs indicated at oral argument that he would, if given leave, amend his complaint to allege the suppression of discussion of political and social views more explicitly.

Because the complaint, either as pleaded or as amended, states a claim of infringement of the First Amendment on at least one theory, the majority's lengthy discussion of plaintiffs' main legal theory is inappropriate. Drawing the line between the local school Board's rightful prerogative to decide high school curricula and the methodology of teachers and Board ukases involving infringements of the First Amendment is difficult, to say the least. But however difficult, the line should be drawn, in my judgment, not on pleadings but on concrete facts developed at trial.

---

**10.** Accordingly, we express no view on the argument defendants have pressed here that the amended complaint should be dismissed for want of exhaustion of administrative remedies.