# United States Court of Appeals
## For the First Circuit

No. 07-1528

DAVID PARKER; TONIA PARKER; JOSHUA PARKER; JACOB PARKER; JOSEPH
ROBERT WIRTHLIN; ROBIN WIRTHLIN; JOSEPH ROBERT WIRTHLIN, JR.,

Plaintiffs, Appellants,

v.

WILLIAM HURLEY; PAUL B. ASH; HELEN LUTTON; THOMAS R. DIAZ; OLGA
GUTTAG; SCOTT BURSON; ANDRE RAVENELLE; JONI JAY; JENNIFER
WOLFRUM; HEATHER KRAMER; TOWN OF LEXINGTON; THOMAS GRIFFITH,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
OF THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Robert S. Sinsheimer with whom Jeffrey A. Denner, Neil Tassel,
and Denner Pellegrino, LLP, were on brief for appellants.
John K. Davis with whom Pierce, Davis & Perritano, LLP, was on
brief for appellees.
Eben A. Krim, Mark W. Batten, Proskauer Rose, LLP, Sarah R.
Wunsch, ACLU Foundation of Massachusetts, Kenneth Y. Choe, James D.
Esseks, and ACLU Foundation on brief for American Civil Liberties
Union; American Civil Liberties Union of Massachusetts; Lexington
Community Action for Responsible Education and Safety; Lexington
Education Association; Massachusetts Teachers Association; and
Respecting Differences, amici curiae.
Harvey J. Wolkoff, Bonnie S. McGuire, Ropes & Gray LLP, Robert

O. Trestan, Steven M. Freeman, Steven C. Sheinberg, Deborah Cohen, and Anti-Defamation League on brief for Anti-Defamation League, amicus curiae.

Nima R. Eshghi, Mary L. Bonauto, Gary D. Buseck, and Gay & Lesbian Advocates & Defenders on brief for Gay & Lesbian Advocates & Defenders; Gay, Lesbian & Straight Education Network; Greater Boston Parents, Families and Friends of Lesbians and Gays; Human Rights Campaign; Human Rights Campaign Foundation; and the Massachusetts Women's Bar Association, amici curiae.

---

January 31, 2008

---

**LYNCH**, **Circuit Judge**.  Two sets of parents, whose religious beliefs are offended by gay marriage and homosexuality, sued the Lexington, Massachusetts school district in which their young children are enrolled.  They assert that they must be given prior notice by the school and the opportunity to exempt their young children from exposure to books they find religiously repugnant.  Plaintiffs asserted violations of their own and their children's rights under the Free Exercise Clause and their substantive parental and privacy due process rights under the U.S. Constitution.

The Parkers object to their child being presented in kindergarten and first grade with two books that portray diverse families, including families in which both parents are of the same gender.  The Wirthlins object to a second-grade teacher's reading to their son's class a book that depicts and celebrates a gay marriage.  The parents do not challenge the use of these books as part of a nondiscrimination curriculum in the public schools, but challenge the school district's refusal to provide them with prior notice and to allow for exemption from such instruction.  They ask for relief until their children are in seventh grade.

Massachusetts does have a statute that requires parents be given notice and the opportunity to exempt their children from curriculum which primarily involves human sexual education or human sexuality issues.  Mass. Gen. Laws ch. 71, § 32A.  The school

system has declined to apply this statutory exemption to these plaintiffs on the basis that the materials do not primarily involve human sexual education or human sexuality issues.

The U.S. District Court dismissed plaintiffs' complaint for failure to state a federal constitutional claim upon which relief could be granted. Fed. R. Civ. P. 12(b)(6); Parker v. Hurley, 474 F. Supp. 2d 261, 263 (D. Mass. 2007). Plaintiffs appeal.

## I.

Because plaintiffs appeal the dismissal of their complaint under Rule 12(b)(6), we take the allegations in their complaint as true and draw all reasonable inferences in plaintiffs' favor. Otero v. Commonwealth of P.R. Indus. Comm'n, 441 F.3d 18, 20 (1st Cir. 2006).

In addition to the complaint, we consider the three books plaintiffs find objectionable.[1] We also take notice of the statewide curricular standards of the Commonwealth of Massachusetts and start with those to put this dispute in context.

---

[1] Normally, documents not included in the original pleading cannot be considered on a Rule 12(b)(6) motion without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(b). However, "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

-4-

A.          <u>Massachusetts Statewide Curricular Standards</u>

The Commonwealth of Massachusetts enacted a comprehensive education reform bill in 1993, requiring the State Board of Education (SBE) to establish academic standards for core subjects. Mass. Gen. Laws ch. 69, § 1D. The statute mandates that the standards "be designed to inculcate respect for the cultural, ethnic and racial diversity of the commonwealth." <u>Id.</u> Further, "[a]cademic standards shall be designed to avoid perpetuating gender, cultural, ethnic or racial stereotypes." <u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> § 1E (requiring same for the establishment of curricular frameworks). The statute does not specify sexual orientation in these lists.

The SBE established such standards, including a Comprehensive Health Curriculum Framework in 1999. That Framework establishes Learning Standards, which set different measurable goals for students in pre-kindergarten through grade 5, grades 6-8, and grades 9-12. The Health Framework also specifically notes that "public schools must notify parents before implementing curriculum that involves human sexuality."

Within the Framework are Strands, and Strands have different components. Under the Social and Emotional Health Strand, there is a Family Life component, which states:

> Students will gain knowledge about the significance of the family on individuals and society, and will learn skills to support the family, balance work and family life, be an

-5-

effective parent, and nurture the development of children.

The Learning Standard for elementary school grades under the Family Life component states that children should be able to "[d]escribe different types of families."

In addition, the Social and Emotional Health Strand includes an Interpersonal Relationships component. That component provides:

> Students will learn that relationships with others are an integral part of the human life experience and the factors that contribute to healthy interpersonal relationships, and will acquire skills to enhance and make many of these relationships more fulfilling through commitment and communication.

The associated Learning Standard for pre-kindergarten through grade 5 recommends that children be able to "[d]escribe the concepts of prejudice and discrimination."

It is not until grades 6-8 that the Learning Standards under this component address "the detrimental effect of prejudice (such as prejudice on the basis of race, gender, sexual orientation, class, or religion) on individual relationships and society as a whole."

There is also a Reproduction/Sexuality component under the Physical Health Strand. Within that component, the Learning Standards provide that by grade 5, students should be able to "[d]efine sexual orientation using the correct terminology (such as heterosexual, and gay and lesbian)."

These statewide academic standards do not purport to select particular instructional materials, but only to be a guide to assist others in that selection. Mass. Gen. Laws ch. 69, § 1E. Thus, there is no statewide regulation or policy providing for the use of the particular texts in dispute here.

By statute, the actual selection of books is the responsibility of a school's principal, with the approval of the superintendent of schools. Mass. Gen. Laws ch. 71, § 48. We assume these books were chosen locally subject to the terms of that statute. Plaintiffs allege in their complaint that Lexington school officials began integrating books like these into their elementary school's curriculum at the behest of gay rights advocates. Compl. ¶¶ 32-33.

In 1996, the Massachusetts legislature adopted a parental notification statute to be implemented by schools starting with the 1997-1998 school year. Mass. Gen. Laws ch. 71, § 32A. Section 32A requires school districts to provide parents with notice of and an opportunity to exempt their children from "curriculum which primarily involves human sexual education or human sexuality issues." The Commissioner of Education, in an advisory opinion guiding the implementation of the new law, noted that it was intended to apply to discrete curricular units, such as "any courses (typically, sex education or portions of a health education or science course), school assemblies or other instructional

activities and programs."[2] Schools must make the relevant curricular materials available for parents to review, though they do not necessarily have to allow parents to observe the classes. The statute mandates that the Department of Education promulgate regulations for resolving any disputes arising under section 32A, which the Department has done. See 603 Mass. Code Regs. 5.01 et seq. Lexington has a section 32A policy in place.

On November 18, 2003, a divided Supreme Judicial Court of Massachusetts held, in Goodridge v. Department of Public Health, 798 N.E.2d 941 (Mass. 2003), that the state constitution mandates the recognition of same-sex marriage. A later effort to reverse this decision through the mechanism of a constitutional convention and a popular vote failed.

B.      The Parkers

David and Tonia Parker's sons, Jacob and Joshua Parker, and Joseph and Robin Wirthlin's son, Joseph Robert Wirthlin, Jr., are students at Estabrook Elementary School in Lexington, Massachusetts. Both families assert that they are devout Judeo-Christians and that a core belief of their religion is that

---

[2] That statute has been interpreted in an opinion letter by the Department of Education not to apply to educational materials designed to promote tolerance, including materials recognizing differences in sexual orientation, if those materials are presented "without further instruction or discussion of the physical and sexual implications of homosexuality."

homosexual behavior and gay marriage are immoral and violate God's law.

In January 2005, when Jacob Parker ("Jacob") was in kindergarten, he brought home a "Diversity Book Bag." This included a picture book, Who's in a Family?, which depicted different families, including single-parent families, an extended family, interracial families, animal families, a family without children, and -- to the concern of the Parkers -- a family with two dads and a family with two moms. The book concludes by answering the question, "Who's in a family?": "The people who love you the most!" The book says nothing about marriage.

The Parkers were concerned that this book was part of an effort by the public schools "to indoctrinate young children into the concept that homosexuality and homosexual relationships or marriage are moral and acceptable behavior." Compl. ¶ 30. Such an effort, they feared, would require their sons to affirm a belief inconsistent with their religion. Id. ¶ 33. On January 21, 2005, they met with Estabrook's principal, Joni Jay ("Jay"), to request that Jacob not be exposed to any further discussions of homosexuality. Principal Jay disagreed that the school had any obligation under section 32A to notify parents in advance of such class discussions. In March 2005, the Parkers repeated their request that "no teacher or adult expose [Jacob] to any materials or discussions featuring sexual orientation, same-sex unions, or

homosexuality without notification to the Parkers and the right to 'opt out,'" this time including in their communication the then-Superintendent of Lexington's schools, William Hurley ("Hurley"), and two other district-wide administrators.  Id. ¶ 34.  This request was met with the same response.  A further meeting to discuss these issues was held at Estabrook on April 27, 2005, which resulted in Mr. Parker's arrest when he refused to leave the school until his demands were met.

As the 2005-2006 school year began, Paul Ash ("Ash"), the current Superintendent, released a public statement explaining the school district's position that it would not provide parental notification for "discussions, activities, or materials that simply reference same-gender parents or that otherwise recognize the existence of differences in sexual orientation."  When Jacob entered first grade that fall, his classroom's book collection included Who's in a Family? as well as Molly's Family, a picture book about a girl who is at first made to feel embarrassed by a classmate because she has both a mommy and a mama but then learns that families can come in many different varieties.  In December 2005, the Parkers repeated their request for advance notice, which Superintendent Ash again denied.

C.       The Wirthlins

We turn to the other plaintiff family.

In March 2006, an Estabrook teacher read aloud King and King to her second grade class, which included Joseph Robert Wirthlin, Jr. ("Joey"). This picture book tells the story of a prince, ordered by his mother to get married, who first rejects several princesses only to fall in love with another prince. A wedding scene between the two princes is depicted. The last page of the book shows the two princes kissing, but with a red heart superimposed over their mouths. There is no allegation in the complaint that the teacher further discussed the book with the class. That evening, Joey told his parents about the book; his parents described him as "agitated" and remembered him calling the book "so silly." Id. ¶ 57. Eventually the Wirthlins were able to secure a meeting with the teacher and Jay on April 6, 2006, to object to what they considered to be indoctrination of their son about gay marriage in contravention of their religious beliefs. Jay reiterated the school district's position that no prior notice or exemption would be given.

D.      Procedural History

On April 27, 2006, the Parkers and the Wirthlins filed suit on behalf of themselves and their children in federal district court against Hurley, Ash, Jay, and Joey Wirthlin's teacher, as well as the town of Lexington, the members of its school board, and other school district administrators.

The complaint alleges that the public schools are systematically indoctrinating the Parkers' and the Wirthlins' young children contrary to the parents' religious beliefs and that the defendants held "a specific intention to denigrate the [families'] sincere and deeply-held faith." Id. ¶ 66. They claim, under 42 U.S.C. § 1983, violations of their and their children's First Amendment right to the free exercise of religion and of their Fourteenth Amendment due process right to parental autonomy in the upbringing of their children, as well as of their concomitant state rights.[3] They also assert a violation of the Massachusetts "opt out" statute, Mass. Gen. Laws ch. 71, § 32A.

The plaintiffs argue that their ability to influence their young children toward their family religious views has been undercut in several respects. First, they believe their children are too young to be introduced to the topic of gay marriage. They also point to the important influence teachers have on this age group. They fear their own inability as parents to counter the school's approval of gay marriage, particularly if parents are

---

[3] The plaintiffs also claim that defendants violated § 1983 by conspiring to deprive them of these constitutional rights. They do not assert an Establishment Clause claim.

We note that the Supreme Judicial Court has held that the Massachusetts state constitution provides greater protection for free exercise claims then does the federal constitution. Attorney Gen. v. Desilets, 636 N.E.2d 233, 235-36 (Mass. 1994). Plaintiffs brought their suit in federal court and have chosen not to request certification of any state law issues to the Supreme Judicial Court.

given no notice that such curricular materials are in use.  As for the children, the parents fear that they are "essentially" required "to affirm a belief inconsistent with and prohibited by their religion."  Compl. ¶ 33.  The parents assert it is ironic, and unconstitutional under the Free Exercise Clause, for a public school system to show such intolerance towards their own religious beliefs in the name of tolerance.

For relief, the plaintiffs seek a declaration of their constitutional rights; damages; and an injunction requiring the school (1) to provide an opportunity to exempt their children from "classroom presentations or discussions the intent of which is to have children accept the validity of, embrace, affirm, or celebrate views of human sexuality, gender identity, and marriage constructs," (2) to allow the parents to observe any such classroom discussions, and (3) to not present any "materials graphically depicting homosexual physical contact" to students before the seventh grade.[4]

The defendants moved to dismiss for failure to state a claim upon which relief could be granted.  Fed. R. Civ. P. 12(b)(6).  After hearing oral arguments, the district court granted

---

[4]     In the request for injunctive relief, plaintiffs also sought an opt-out right regarding "classroom presentations or discussions when the intent is to have children accept the validity of, embrace, affirm or celebrate belief systems or religious perspectives."  Because the complaint does not allege any instance of such a classroom presentation or discussion, we do not further consider this particular claim for relief.

the defendants' motion on February 23, 2007. The court dismissed the state claims without prejudice so that they could be reasserted in state court. Parker, 474 F. Supp. 2d at 263.

As to the federal claims, the district court found this case indistinguishable from Brown v. Hot, Sexy & Safer Productions, 68 F.3d 525 (1st Cir. 1995). In Brown, this circuit held that the Free Exercise Clause and the parents' substantive due process rights were not violated by one instance of a school system's failure to provide prior notice and an exemption for a specific high school assembly on human sexuality. Holding that Brown was analytically identical to the present case, the district court applied rational basis review and concluded that the state's interest in preventing discrimination, specifically discrimination targeted at students in school, justified the policy of the Lexington schools. Parker, 474 F. Supp. 2d at 268, 274-75.

## II.

Our review of the district court's order of dismissal is de novo. Otero, 441 F.3d at 20. Plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (citations omitted). We affirm the order of dismissal, albeit on grounds different from the district court's reasoning. See Otero, 441 F.3d at 20.

-14-

There are several ways to approach the parents' claim depending upon how this case is categorized. One could start by asking how strong the school's interest must be to justify the denial of the parents' request for an exemption (as opposed to asking about the nature of the plaintiffs' interests, as we do below). The parties have focused on the standard of justification the defendants must meet in the aftermath of Employment Division v. Smith, 494 U.S. 872 (1990). What is clear from Smith is that not all free exercise challenges will survive motions to dismiss and not all will receive strict scrutiny review.

One possible answer is that, under Smith, the school may have to show no more than that its choice of books and its refusal to provide exemption is rational. In Smith, the Court rejected the plaintiffs' claim that they had unconstitutionally been denied unemployment benefits due to their violation of Oregon's general criminal prohibition on the use of peyote, even though they had used the peyote for religious purposes. The Court found no free exercise objection to the criminal statute's enforcement because, as it summarized in a later case, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

If Smith's mere rationality test were the applicable standard, this case would easily be dismissed. Plaintiffs do not contest that the defendants have an interest in promoting tolerance, including for the children (and parents) of gay marriages. The Supreme Court has often referred to the role of public education in the preparation of students for citizenship. See, e.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681-85 (1986) (upholding ability of schools to prohibit lewd speech). Given that Massachusetts has recognized gay marriage under its state constitution, it is entirely rational for its schools to educate their students regarding that recognition.[5]

In plaintiffs' favor, however, we will assume their case is not necessarily subject to this general Smith rule. First, the case does not arise in the same context as Smith. Plaintiffs have not engaged in conduct prohibited by state law or otherwise sought to avoid compliance with a law of general applicability.[6] Nor does

_____

[5]     We do not reach the question of whether there is a compelling interest, either state or federal, in teaching tolerance for gay marriage to elementary school students in the public school system. Cf. Bob Jones Univ. v. United States, 461 U.S. 574, 604 (1983) (holding that federal government's compelling interest in eradicating racial discrimination outweighed plaintiffs' free exercise claim); Moore v. City of E. Cleveland, 431 U.S. 494, 499-500 (1977) (holding that city lacked compelling justification for impinging on due process right of familial privacy).

[6]     In City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court appeared to assume that Smith would apply to non-criminal regulations such as zoning ordinances. Id. at 535. At least four circuits have held that Smith is not limited to criminal prohibitions. Fairbanks v. Brackettville Bd. of Educ., No. 99-

-16-

state law or a formal policy require that the defendants take the actions they did. Indeed, there is not even a formal, district-wide policy of affirming gay marriage through the use of such educational materials with young students.

In contrast to the mere rationality standard for neutral laws of general applicability, Smith and its progeny require a compelling justification for any law that targets religious groups. See Lukumi, 508 U.S. at 546 (invalidating law targeting religious group). This case also does not fit into the "targeting" category, as the Supreme Court has used the phrase. The school was not singling out plaintiffs' particular religious beliefs or targeting its tolerance lessons to only those children from families with religious objections to gay marriage. Cf. id. at 542. The fact that a school promotes tolerance of different sexual orientations and gay marriage when such tolerance is anathema to some religious groups does not constitute targeting.

The Smith Court, in our view, left open other possible approaches. The Court in Smith did not say it overruled any prior free exercise cases. For example, it reinterpreted the balancing

_____

50265, 2000 WL 821401, at *2 (5th Cir. May 30, 2000); Miller v. Reed, 176 F.3d 1202, 1207 (9th Cir. 1999); Vandiver v. Hardin County Bd. of Educ., 925 F.2d 927, 932 (6th Cir. 1991); Salvation Army v. Dep't of Cmty. Affairs, 919 F.2d 183, 194-96 (3d Cir. 1990); see also Gary S. v. Manchester Sch. Dist., 374 F.3d 15, 18-19 (1st Cir. 2004) (refusing to limit the Smith rule to statutes related to socially harmful conduct).

test of Sherbert v. Verner, 374 U.S. 398 (1963),[7] under which the court "asks whether the government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden," Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). Smith clarified that the Sherbert test does not apply to violations of a general prohibition. Smith, 494 U.S. at 883-85. The Court expressed unwillingness to apply the Sherbert test outside the unemployment compensation cases in which it had found free exercise violations, id. at 883, explaining that the Sherbert approach was "developed in a context that lent itself to individualized governmental assessment" of each plaintiff's "particular circumstances," id. at 884. Thus it summarized the Sherbert line of cases as "stand[ing] for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Id. Plaintiffs have not argued that they fit within this redefinition of Sherbert, so we do not address the theory.[8]

_____

[7] But cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (describing Smith as "reject[ing] the interpretation of the Free Exercise Clause announced in Sherbert").

[8] Plaintiffs have not argued, for example, that the Commonwealth, having provided an exemption for sex education under Mass. Gen. Laws ch. 71, § 32A, is compelled by either the state or federal constitution to extend the exemption to this situation.

Smith, by its terms, also carved out an area of "hybrid situations." Id. at 881-82. Plaintiffs argue this is where their claim fits. Smith described such hybrid situations as involving free exercise claims brought in conjunction with other claims of violations of constitutional protections. Smith gave as one example of a companion claim "the right of parents . . . to direct the education of their children," citing to Pierce v. Society of Sisters, 268 U.S. 510 (1925), and Wisconsin v. Yoder, 406 U.S. 205 (1972). Smith, 494 U.S. at 881. In this hybrid category, Smith

_____

Indeed, there are factual distinctions between the two situations. Sex education as referred to in section 32A is usually set out as an independent course segment at prearranged times and places. Notice and exemption is thus far easier to accomplish. By contrast, the notice and exemption requested here would require broad advance notice of "any adult-directed or initiated classroom discussions of sexuality, gender identity, and marriage constructs," discussions that could arise often in almost any part of the curriculum.

Plaintiffs do point out, however, that because this case was decided on a motion to dismiss, the defendants have put on no evidence that the school system would bear any burden if required to give them this notice and exemption. Defendants have not, for instance, argued that granting the plaintiffs an exemption from such classroom instruction would violate the Establishment Clause. See Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 144-45 (1987) ("[G]overnment may (and sometimes must) accommodate religious practices . . . without violating the Establishment Clause.").

Amici, however, argue that such exemptions would significantly burden the schools because (1) there would be an exodus from classrooms if plaintiffs received the relief requested and that (2) this in turn would send a message that children of same-sex parents are inferior. This is mere supposition and may not be credited on a motion to dismiss, where inferences must be drawn in the plaintiffs' favor. Plaintiffs argue for their part that the remedy they seek would teach other students tolerance of different religious beliefs.

-19-

also included cases of compelled expression decided on free speech grounds, but which also involved freedom of religion, such as West Virginia Board of Education v. Barnette, 319 U.S. 624 (1943). Smith, 494 U.S. at 882. The Smith Court commented that only in these hybrid situations had the Court ever held that "the First Amendment bar[red] application of a neutral, generally applicable law to religiously motivated action." Id. at 881.

What the Court meant by its discussion of "hybrid situations" in Smith has led to a great deal of discussion and disagreement. See, e.g., E. Chemerinsky, Constitutional Law § 12.3.2.3, at 1262 (3d ed. 2006) (noting different treatments of the hybrid rights language by the lower courts). Observers debate whether Smith created a new hybrid rights doctrine, or whether in discussing "hybrid situations" the Court was merely noting in descriptive terms that it was not overruling certain cases such as Pierce and Yoder. Compare M.E. Lechliter, Note, The Free Exercise of Religion and Public Schools: The Implication of Hybrid Rights on the Religious Upbringing of Children, 103 Mich. L. Rev. 2209, 2220-21 (2005), with M.W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. Chi. L. Rev. 1109, 1121-22 (1990). Courts and commentators also disagree over how strong the companion constitutional claim must be to establish a hybrid situation: whether, for example, the associated claim must be independently viable, or whether it is enough for the claim to be "colorable."

See, e.g., Miller v. Reed, 176 F.3d 1202, 1207 (9th Cir. 1999) (requiring a colorable claim that another constitutional right has been violated); Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 700 (10th Cir. 1998) (same); Lechliter, supra, at 2226-33 (identifying and describing disagreement among courts).[9] Yet another debate is whether such "hybrid" cases automatically subject the governmental defendant to the compelling state interest test.[10] Plaintiffs argue that they have pled a hybrid claim and that this entitles them to strict scrutiny review, which requires defendants to demonstrate a compelling state interest.

No published circuit court opinion, including Brown, has ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim. See, e.g., Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 764-65 (7th Cir.

_____

[9] Others have interpreted this circuit's decision in Brown as falling into the former category -- that is, requiring an independently viable constitutional claim. See, e.g., Lechliter, supra, at 2226-27; R.C. Miller, Annotation, What Constitutes "Hybrid Rights" Claim, 163 A.L.R. Fed. 493 § 6. Brown did not explicitly consider this debate, and the parental rights claim asserted in that case was found to be so weak that it was not a colorable claim, much less an independently viable one. Thus we do not read Brown as having settled this question or as firmly establishing that Smith created a new category of hybrid claims.

[10] There is no occasion here to consider whether there might be an intermediate step in which the degree of justification may vary with the type of burden asserted. See, e.g., Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 366 & n.7 (3d Cir. 1999) (applying intermediate scrutiny because the plaintiffs' claim arose in the public employment context).

2003); Henderson v. Kennedy, 253 F.3d 12, 19 (D.C. Cir. 2001); Miller, 176 F.3d at 1208; Swanson, 135 F.3d at 700; Salvation Army v. Dep't of Cmty. Affairs, 919 F.2d 183, 199-200 & n.9 (3d Cir. 1990).[11] As for this circuit, Brown noted that Yoder survived Smith, but then explained that the facts in Brown were far from analogous to the unique facts of Yoder, and held that no hybrid claim was presented.[12] Brown, 68 F.3d at 539. Other circuits have held explicitly that Smith does not create a new category of hybrid claims. See, e.g., Leebaert v. Harrington, 332 F.3d 134, 143-44 (2d Cir. 2003); Kissinger v. Bd. of Trs., 5 F.3d 177, 180 (6th Cir. 1993); see also Lukumi, 508 U.S. at 567 (Souter, J., concurring) (describing the hybrid distinction drawn by Smith as "ultimately untenable").

---

[11] A Ninth Circuit panel did apply strict scrutiny, but that opinion was later withdrawn by the court en banc. Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, 714-17 (9th Cir. 1999), vacated by 220 F.3d 1134 (9th Cir. 2000). The D.C. Circuit opinion in EEOC v. Catholic University of America, 83 F.3d 455 (D.C. Cir. 1996), might be read as implying that strict scrutiny would apply in hybrid situations, but its brief discussion of hybrid rights was merely an alternate ground for its holding. See id. at 467.

[12] Also, in Gary S. v. Manchester School District, 374 F.3d 15 (1st Cir. 2004), this court held that no hybrid claim was presented by a disabled private school student's parents, who argued that their son was entitled to all the same services under IDEA as public school students. Id. at 19 (endorsing Gary S. v. Manchester Sch. Dist., 241 F. Supp. 2d 111, 121 (D.N.H. 2003)). The failure to provide those IDEA benefits to private school students does not impose any cognizable burden upon the religion of those who choose private schools. Id. at 20.

Without entering the fray over the meaning and application of Smith's "hybrid situations" language, we approach the parents' claims as the Court did in Yoder. In that case, the Court did not analyze separately the due process and free exercise interests of the parent-plaintiffs, but rather considered the two claims interdependently, given that those two sets of interests inform one other.[13] See Yoder, 406 U.S. at 213-14, 232-34. We do not need to resolve the hybrid rights debate because the level of justification the government must demonstrate -- a rational basis, a compelling interest, or something in between -- is irrelevant in this case. While we accept as true plaintiffs' assertion that their sincerely held religious beliefs were deeply offended, we find that they have not described a constitutional burden on their rights, or on those of their children.

---

[13] While some have criticized the hybrid rights concept, saying it tries to make something out of nothing, see Henderson, 253 F.3d at 19 ("[I]n law as in mathematics zero plus zero equals zero."), others have noted that "it is equally true that the sum of a number of fractions -- one-half plus one-half, for example -- may equal one," R.F. Duncan, Free Exercise Is Dead, Long Live Free Exercise: Smith, Lukumi, and the General Applicability Requirement, 3 U. Pa. J. Const. L. 850, 858 (2001).

In the criminal law, we have recognized that at times the cumulative effect of a series of individual rulings, none of which individually constituted error, could mean the trial was not fair, United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993), though we do not conclude that this is an appropriate analogy.

As in Brown, we do not settle the question of what must be pled to raise a viable hybrid claim, as Smith uses the term. Our point here is rather that parental rights and the free exercise of religion by parents are interests that overlap and inform each other, and thus are sensibly considered together.

-23-

Even if Smith largely set aside in free exercise jurisprudence, at least in some contexts, "the balancing question -- whether the state's interest outweighs the plaintiff's interest in being free from interference," it did not alter the standard constitutional threshold question. N.M. Stolzenberg, "He Drew a Circle That Shut Me Out": Assimilation, Indoctrination, and the Paradox of a Liberal Education, 106 Harv. L. Rev. 581, 592-93 (1993). That question is "whether the plaintiff's free exercise is interfered with at all." Id.; see also Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 451-52 (1988) (denying a free exercise claim despite potential "devastating effects on traditional Indian religious practices" because "the Constitution simply does not provide a principle that could justify upholding respondents' legal claims"); Bauchman ex rel. Bauchman v. W. High Sch., 132 F.3d 542, 557 (10th Cir. 1997) (requiring plaintiff asserting a free exercise claim to demonstrate burden, either through coercion or compulsion). In this case there is no pleading of a constitutionally significant burden on plaintiffs' rights.

In Yoder, the Court found unconstitutional Wisconsin's application of its compulsory school attendance law to Amish parents who believed that any education beyond eighth grade undermined their entire, religiously focused way of life. 406 U.S. at 235-36. The heart of the Yoder opinion is a lengthy consideration of "the interrelationship of belief with [the Amish]

-24-

mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization," and how as a result compulsory high school education would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community."  Id. at 218, 235.  The Court thus found Wisconsin's compulsory attendance law to be flatly incompatible with the plaintiffs' free exercise rights and parental liberty interests, which it considered in tandem.  That is, compulsory attendance at any school -- whether public, private, or home-based -- prevented these Amish parents from making fundamental decisions regarding their children's religious upbringing and effectively overrode their ability to pass their religion on to their children, as their faith required.  Id. at 233-35.  Further, the parents in Yoder were able to demonstrate that their alternative informal vocational training of their older children still met the state's professed interest behind its compulsory attendance requirement.  Id. at 235.

To the extent that Yoder embodies judicial protection for social and religious "sub-groups from the public cultivation of liberal tolerance," plaintiffs are correct to rely on it.  See Stolzenberg, supra, at 637.  But there are substantial differences between the plaintiffs' claims in Yoder and the claims raised in this case.  One ground of distinction is that the plaintiffs have

chosen to place their children in public schools and do not live, as the Amish do, in a largely separate culture. There are others. While plaintiffs do invoke Yoder's language that the state is threatening their very "way of life," they use this language to refer to the centrality of these beliefs to their faith, in contrast to its use in Yoder to refer to a distinct community and life style. Exposure to the materials in dispute here will not automatically and irreversibly prevent the parents from raising Jacob and Joey in the religious belief that gay marriage is immoral. Nor is there a criminal statute involved, or any other punishment imposed on the parents if they choose to educate their children in other ways. They retain options, unlike the parents in Yoder. Tellingly, Yoder emphasized that its holding was essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with any schooling system. See Yoder, 406 U.S. at 235-36. Plaintiffs' case is not Yoder.

Despite defendants' contention, plaintiffs' case is also not Brown. Brown concerned a federal constitutional challenge to a one-time failure by a Massachusetts high school to comply with the notice and exemption procedures required by Mass. Gen. Laws ch. 71, § 32A, for a student's attendance at a discrete sex education assembly. Brown is factually and legally distinct. Most significantly, Brown involved the education of high school

-26-

students, not the education of kindergarten through second-grade students.  Educators treat this age differential as significant. The statewide curricular standards themselves, including those related to sexual orientation, distinguish between elementary and high school students.  Further, as the plaintiffs sensibly point out, high school students are less responsive to what adults say than are very young elementary school children.

The impressionability of young school children has been noted as a relevant factor in the Establishment Clause context. See, e.g., Lee v. Weisman, 505 U.S. 577, 592 (1992) (identifying concerns about the "subtle coercive pressure [of state endorsement of religion] in the elementary and secondary public schools"); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring) (expressing concern about the impact of school prayer and Bible reading on "young impressionable children"); L.H. Tribe, American Constitutional Law, § 14-5, at 1177-79 (2d ed. 1988).  Just as university students "are less impressionable than younger students" when it comes to school policies regarding religion, Widmar v. Vincent, 454 U.S. 263, 274 n.14 (1981), so also are high school students less impressionable than the very youngest children, see Lemon v. Kurtzman, 403 U.S. 602, 616 (1971) (noting that "inculcating religious doctrine is . . . enhanced by the impressionable age of the pupils, in primary

schools particularly"); see also Fleischfresser v. Dirs. of Sch.
Dist. 200, 15 F.3d 680, 686 (7th Cir. 1994).

The relevance of the age of school children has been
noted in a free speech case involving religious expression. Curry
ex rel. Curry v. Hensiner, ___ F.3d ___, 2008 WL 141076, at *6 (6th
Cir. Jan. 16, 2008). The age of the student has also been
identified as relevant in the context of parental due process
rights. See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 185 (3d
Cir. 2005) (recognizing that "introducing a child to sensitive
topics before a parent might have done so herself can complicate
and even undermine parental authority").

We see no principled reason why the age of students
should be irrelevant in Free Exercise Clause cases. See, e.g., M.
Eichner, Who Should Control Children's Education?: Parents,
Children, and the State, 75 U. Cin. L. Rev. 1339, 1382, 1386 (2007)
(age of children should be taken into account when considering
parental due process or free exercise claims in the public school
context). Based on this distinction alone, Brown does not control
this case.

We turn afresh to plaintiffs' complementary due process
and free exercise claims. Plaintiffs' opening premise is that
their rights of parental control are fundamental rights.[14] They

_____

[14] In Washington v. Glucksberg, 521 U.S. 702 (1997), the
Court listed fundamental rights protected by the Due Process
Clause. Id. at 719-20. The Fourteenth Amendment guarantees that

-28-

rely on a Supreme Court decision recognizing a substantive due process right of parents "to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000) (plurality opinion). Troxel is not so broad as plaintiffs assert. The cases cited by the Court in Troxel as establishing this parental right pertain either to the custody of children, which was also the issue in dispute in Troxel, or to the fundamental control of children's schooling, as in Yoder. See id. at 65-66.[15] The Troxel plurality did not, however, specifically address which standard of review to apply when this due process right is implicated.

The schooling cases cited in Troxel "evince the principle that the state cannot prevent parents from choosing a specific educational program." Brown, 68 F.3d at 533 (emphasis added). In Meyer v. Nebraska, 262 U.S. 390 (1923), the Supreme Court found unconstitutional a prohibition on the teaching of foreign languages

---

no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That due process right has both a procedural and a substantive component: it ensures fair process, and it "provides heightened protection against government interference with certain fundamental rights and liberty interests." Glucksberg, 521 U.S. at 720.

[15]   In slight variations on these themes, the Court also cited Parham v. J.R., 442 U.S. 584 (1979), which pertained to the power of parents to commit their children to mental institutions, and Prince v. Massachusetts, 321 U.S. 158 (1944), in which the Court determined that the parent's liberty interest was outweighed in that instance by the state's interest in enforcing child labor and compulsory attendance laws.

to young children in part because it interfered with "the power of parents to control the education of their own." Id. at 401. Two years later, in Pierce v. Society of Sisters, the Court overturned an Oregon statute compelling children to attend public schools on the grounds that the statute "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing of children under their control." Id. at 534-35. Plaintiffs argue their request for notice and exemption is simply a logical extension of their parental rights under Meyer and Pierce, as reinforced by their free exercise rights.

Defendants respond that plaintiffs' argument runs afoul of the general proposition that, while parents can choose between public and private schools, they do not have a constitutional right to "direct how a public school teaches their child." Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395 (6th Cir. 2005). That proposition is well recognized. See, e.g., C.N., 430 F.3d at 184 (recognizing a "distinction between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension"); Leebaert, 332 F.3d at 141 ("Meyer, Pierce, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."); Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275,

291 (5th Cir. 2001) ("It has long been recognized that parental rights are not absolute in the public school context and can be subject to reasonable regulation."); Swanson, 135 F.3d at 699 ("The case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education . . . ."); see also Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1207 (9th Cir. 2005), amended by 447 F.3d 1187 (9th Cir. 2006).  Indeed, Meyer and Pierce specified that the parental interests they recognized would not interfere with the general power of the state to regulate education, including "the state's power to prescribe a curriculum for institutions which it supports."  Meyer, 262 U.S. at 402; see also Pierce, 268 U.S. at 534.

Plaintiffs say, in response, that they are not attempting to control the school's power to prescribe a curriculum.  The plaintiffs accept that the school system "has a legitimate secular interest in seeking to eradicate bias against same-gender couples and to ensure the safety of all public school students."  They assert that they have an equally sincere interest in the accommodation of their own religious beliefs and of the diversity represented by their contrary views.  Plaintiffs specifically disclaim any intent to seek control of the school's curriculum or to impose their will on others.  They do not seek to change the choice of books available to others but only to require notice of

the books and an exemption, and even then only up to the seventh grade. Nonetheless, we have found no federal case under the Due Process Clause which has permitted parents to demand an exemption for their children from exposure to certain books used in public schools.

The due process right of parental autonomy might be considered a subset of a broader substantive due process right of familial privacy. See M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996). The other cases establishing privacy rights under the Due Process Clause pertain to such issues as the right to marry, e.g., Loving v. Virginia, 388 U.S. 1 (1967) (state cannot outlaw miscegenation), and the right to procreate, e.g., Skinner v. Oklahoma, 316 U.S. 535 (1942) (state cannot forcibly sterilize convicts), and are not relevant to plaintiffs' claims. In sum, the substantive due process clause by itself, either in its parental control or its privacy focus, does not give plaintiffs the degree of control over their children's education that their requested relief seeks. We turn then to whether the combination of substantive due process and free exercise interests give the parents a cause of action.

The First Amendment's prohibition on laws "respecting an establishment of religion, or prohibiting the free exercise thereof" applies to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). In Smith, the Supreme Court noted that the "free exercise of religion means,

first and foremost, the right to believe and profess whatever religious doctrine one desires." 494 U.S. at 877. As a result, the government may not, for example, (1) compel affirmation of religious beliefs; (2) punish the expression of religious doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma. Id.[16]

The Free Exercise Clause, importantly, is not a general protection of religion or religious belief. It has a more limited reach of protecting the free exercise of religion. In Lyng, the Court noted that there and in Bowen v. Roy, 476 U.S. 693 (1986), no free exercise claim was stated even though "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs." 485 U.S. at 449. There was no free exercise problem in those cases because "[i]n neither case . . .

---

[16] While this case is not a funding case, the Court has most recently held that in such cases there is no significant burden on free exercise rights where, as here, the government has "impose[d] neither criminal nor civil sanctions on any type of religious service or rite," and where it "does not require students to choose between their religious beliefs and receiving a government benefit." Locke v. Davey, 540 U.S. 712, 720-21 (2004). As here, the government in Locke made no attempt to regulate the plaintiffs' conduct. Id.; see D. Laycock, Supreme Court, 2003 Term -- Case Comment: Theology Scholarships, the Pledge of Allegiance, and Religious Liberty: Avoiding the Extremes but Missing the Liberty, 118 Harv. L. Rev. 155, 214-15 (2004).

would the affected individuals be coerced by the Government's action into violating their religious beliefs." <u>Id.</u>  As the Court said in <u>Roy</u>, "[n]ever to our knowledge has the Court interpreted the First Amendment to require the Government <u>itself</u> to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."  476 U.S. at 699; <u>see also</u> <u>Sherbert</u>, 374 U.S. at 412 (Douglas, J., concurring) ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.").  Specifically, "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion."  <u>Schempp</u>, 374 U.S. at 223.

Preliminarily, we mark the distinction between the alleged burden on the parents' free exercise rights and the alleged burden on their children's.  The right of parents "to direct the religious upbringing of their children," <u>Yoder</u>, 406 U.S. at 233, is distinct from (although related to) any right their children might have regarding the content of their school curriculum.  <u>See</u> <u>Elk Grove Unified Sch. Dist.</u> v. <u>Newdow</u>, 542 U.S. 1, 16-18 (2004) (where father lacked legal power to sue on behalf of his daughter, he could assert a right to influence her religious upbringing but lacked standing to challenge her exposure to ideas presented to her by third parties).  <u>But</u> <u>see</u> <u>id.</u> at 24 n.2 (Rehnquist, C.J.,

-34-

concurring in the judgment) (Newdow's right should not be treated as distinct from his daughter's). This is not a new distinction. In _Prince_ v. _Massachusetts_, 321 U.S. 158 (1944), the Court explained that "two claimed liberties are at stake. One is the parent's, to bring up the child in the way [the parent desires], which for appellant means to teach him the tenets and the practices of their faith. The other freedom is the child's, to observe these [tenets and practices]." _Id._ at 164; see also _Fleischfresser_, 15 F.3d at 683-84. We start with the parents' claim.

Generally, the fundamental parental control/free exercise claims regarding public schools have fallen into several types of situations: claims that failure to provide benefits given to public school students violates free exercise rights,[17] claims that plaintiffs should not be subjected to compulsory education,[18] demands for removal of offensive material from the curriculum,[19]

---

[17] _See, e.g._, _Gary S._ v. _Manchester Sch. Dist._, 374 F.3d 15, 19-21 (1st Cir. 2004); _Swanson_, 135 F.3d at 698, 702 (no due process or free exercise violation in school district's refusal to allow home-schooled students to attend public schools part-time).

[18] _See, e.g._, _Yoder_, 406 U.S. 205; _Murphy_ v. _Arkansas_, 852 F.2d 1039 (8th Cir. 1988) (no due process or free exercise violation in state setting requirements for home schooling); _Duro_ v. _Dist. Attorney_, 712 F.2d 96 (4th Cir. 1983) (no _Yoder_-like constitutional problem with state statute prohibiting home schooling).

[19] _See, e.g._, _Williams_ v. _Bd. of Educ._, 388 F. Supp. 93 (D. W. Va. 1975) (no violation of free exercise or privacy rights in school's use of textbooks that offend plaintiffs' religious beliefs). The amici's attempts to fit plaintiffs' claim into this third type -- removal of material from the school's curriculum --

and, as here, claims that there is a constitutional right to exemption from religiously offensive material.[20] See also M. Stewart, The First Amendment, the Public Schools, and the Inculcation of Community Values, 18 J. L. & Educ. 23, 86 (1989).

In two cases in which plaintiffs did not raise a related parental rights due process claim, federal courts have rejected free exercise claims seeking exemptions from the schools' assignment of particular books. In Fleischfresser, the parents sought to prevent the use of the Impressions Reading Series as a supplemental reading program for an elementary school. 15 F.3d at 683. The parents complained that the series fostered a belief in the existence of superior beings and indoctrinated their children in values such as despair, deceit, and parental disrespect, values different from their Christian beliefs. Id. at 683, 689. The Seventh Circuit held that any burden on free exercise rights was, at most, minimal. The parents were not precluded from meeting their religious obligation to instruct their children, nor were the

_____

fails. Plaintiffs do not claim a general right of censorship, only that they have a right to notice and exemption.

[20] See, e.g., Leebaert, 332 F.3d 134 (no free exercise or parental due process right violated by school's refusal to exempt student from mandatory health class); Littlefield, 268 F.3d 275 (no parental due process or free exercise violation in refusal to exempt child from mandatory uniform policy); Morrison ex rel. Morrison v. Bd. of Educ., 419 F. Supp. 2d 937 (E.D. Ky. 2006) (no right to exempt child from mandatory school diversity training on homosexuality), rev'd on other grounds, 507 F.3d 494 (6th Cir. 2007).

parents or children compelled to do anything or refrain from doing anything of a religious nature.  Thus, no coercion existed.  Id. at 690.

In Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir. 1987), which is more factually similar to this case, the Sixth Circuit rejected a broader claim for an exemption from a school district's use of an entire series of texts.  The parents in that case asserted that the books in question taught values contrary to their religious beliefs and that, as a result, the school violated the parents' religious beliefs by allowing their children to read the books and violated their children's religious beliefs by requiring the children to read them.  Id. at 1060.  The court, however, found that exposure to ideas through the required reading of books did not constitute a constitutionally significant burden on the plaintiffs' free exercise of religion.  Id. at 1065. In so holding, the court emphasized that "the evil prohibited by the Free Exercise Clause" is "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion," and reading or even discussing the books did not compel such action or affirmation.  Id. at 1066, 1069.

In the present case, the plaintiffs claim that the exposure of their children, at these young ages and in this setting, to ways of life contrary to the parents' religious beliefs

-37-

violates their ability to direct the religious upbringing of their children. We try to identify the categories of harms alleged. The parents do not allege coercion in the form of a direct interference with their religious beliefs, nor of compulsion in the form of punishment for their beliefs, as in Yoder. Nor do they allege the denial of benefits. Further, plaintiffs do not allege that the mere listening to a book being read violated any religious duty on the part of the child. There is no claim that as a condition of attendance at the public schools, the defendants have forced plaintiffs -- either the parents or the children -- to violate their religious beliefs. In sum there is no claim of direct coercion.

The heart of the plaintiffs' free exercise claim is a claim of "indoctrination": that the state has put pressure on their children to endorse an affirmative view of gay marriage and has thus undercut the parents' efforts to inculcate their children with their own opposing religious views. The Supreme Court, we believe, has never utilized an indoctrination test under the Free Exercise Clause, much less in the public school context. The closest it has come is Barnette, a free speech case that implicated free exercise interests and which Smith included in its hybrid case discussion. In Barnette, the Court held that the state could not coerce acquiescence through compelled statements of belief, such as the mandatory recital of the pledge of allegiance in public schools.

319 U.S. at 634, 642. It did not hold that the state could not attempt to inculcate values by instruction, and in fact carefully distinguished the two approaches. Id. at 631, 640; see also Stewart, supra, at 74. We do not address whether or not an indoctrination theory under the Free Exercise Clause is sound. Plaintiffs' pleadings do not establish a viable case of indoctrination, even assuming that extreme indoctrination can be a form of coercion.

First, as to the parents' free exercise rights, the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently. A parent whose "child is exposed to sensitive topics or information [at school] remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials." C.N., 430 F.3d at 185; see also Newdow, 542 U.S. at 16 (noting that the school's requirement that Newdow's daughter recite the pledge of allegiance every day did not "impair[] Newdow's right to instruct his daughter in his religious views"). The parents here did in fact have notice, if not prior notice, of the books and of the school's overall intent to promote toleration of same-sex marriage, and they retained their ability to discuss the material and subject matter

with their children.  Our outcome does not turn, however, on whether the parents had notice.

Turning to the children's free exercise rights, we cannot see how Jacob's free exercise right was burdened at all: two books were made available to him, but he was never required to read them or have them read to him.  Further, these books do not endorse gay marriage or homosexuality, or even address these topics explicitly, but merely describe how other children might come from families that look different from one's own.  There is no free exercise right to be free from any reference in public elementary schools to the existence of families in which the parents are of different gender combinations.

Joey has a more significant claim, both because he was required to sit through a classroom reading of <u>King and King</u> and because that book affirmatively endorses homosexuality and gay marriage.  It is a fair inference that the reading of <u>King and King</u> was precisely <u>intended</u> to influence the listening children toward tolerance of gay marriage.  That was the point of why that book was chosen and used.  Even assuming there is a continuum along which an intent to influence could become an attempt to indoctrinate, however, this case is firmly on the influence-toward-tolerance end.  There is no evidence of systemic indoctrination.  There is no allegation that Joey was asked to affirm gay marriage.  Requiring

a student to read a particular book is generally not coercive of free exercise rights.

Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them. See Fleischfresser, 15 F.3d at 690; Mozert, 827 F.2d at 1063-65, 1070; see also Bauchman, 132 F.3d at 558 ("[P]ublic schools are not required to delete from the curriculum all materials that may offend any religious sensibility." (quoting Florey v. Sioux Falls Sch. Dist. 49-5, 619 F.2d 1311, 1318 (8th Cir. 1980) (internal quotation marks omitted))). The reading of King and King was not instruction in religion or religious beliefs.[21] Cf. Barnette, 319 U.S. at 631 (distinguishing between compelling students to declare a belief through mandatory recital of the pledge of allegiance, which violates free exercise, and "merely . . . acquaint[ing students] with the flag salute so that they may be informed as to what it is or even what it means").

On the facts, there is no viable claim of "indoctrination" here. Without suggesting that such showings would

_____

[21] Indeed, in Schempp the Court suggested that even if a series of mandatory classroom Bible readings violated the Free Exercise Clause, the study of the Bible or religion, if "presented objectively as part of a secular program of education, may [] be effected consistently with the First Amendment." 374 U.S. at 225.

suffice to establish a claim of indoctrination, we note the plaintiffs' children were not forced to read the books on pain of suspension. Nor were they subject to a constant stream of like materials. There is no allegation here of a formalized curriculum requiring students to read many books affirming gay marriage. Cf. Mozert, 827 F.2d at 1079 (Boggs, J., concurring) (concluding that such facts could constitute a burden on free exercise, although such a burden would be constitutionally permissible in the public school context if parents still retained other educational options). The reading by a teacher of one book, or even three, and even if to a young and impressionable child, does not constitute "indoctrination."

Because plaintiffs do not allege facts that give rise to claims of constitutional magnitude, the district court did not err in granting defendants' motion to dismiss the claims under the U.S. Constitution.

### III.

Public schools often walk a tightrope between the many competing constitutional demands made by parents, students, teachers, and the schools' other constituents. Cf. Morse v. Frederick, 127 S. Ct. 2618 (2007) (students' First Amendment free speech rights versus interest in administering schools without encouragement of illegal drug use); Hennessy v. City of Melrose, 194 F.3d 237 (1st Cir. 1999) (public school's interest in

-42-

implementing its curriculum versus student teacher's interest in expressing opposition to abortion and homosexuality); Zykan ex rel. Zykan v. Warsaw Cmty. Sch. Corp., 631 F.2d 1300, 1304 (7th Cir. 1980) (students' First Amendment "freedom to hear" under Va. State Pharmacy Bd. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748 (1976), versus school's interest in limiting exposure to materials that might harm intellectual and social development); see also Lyng, 485 U.S. at 452 ("The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours."). The balance the school struck here does not offend the Free Exercise or Due Process Clauses of the U.S. Constitution.

We do not suggest that the school's choice of books for young students has not deeply offended the plaintiffs' sincerely held religious beliefs. If the school system has been insufficiently sensitive to such religious beliefs, the plaintiffs may seek recourse to the normal political processes for change in the town and state. See Smith, 494 U.S. at 890. They are not entitled to a federal judicial remedy under the U.S. Constitution.

We affirm the district court's dismissal with prejudice of plaintiffs' federal claims and its dismissal without prejudice of the state claims so that they may be reinstated, should plaintiffs choose, in state court.

Affirmed.